JOHN D. BLIXT vs. KRISTIN BLIXT & another.[1]

Plymouth. February 5, 2002. - September 9, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Due Process of Law,* Grandparent visitation. *Constitutional Law,* Equal protection of laws. *Statute,* Validity, Construction. *Grandparent. Parent and Child,* Interference with parental rights. *Minor,* Visitation rights.

Discussion of the principles governing a facial constitutional challenge to a statute as well as considerations stated by the United States Supreme Court in *Troxel* v. *Granville,* 530 U.S. 57 (2000), as to due process implications of grandparent visitation statutes. [651-655]

This court, in rejecting a parent's facial due process challenge to G. L. c. 119, § 39D, the grandparent visitation statute, concluded that the statute satisfied the so-called strict scrutiny formula because its construction narrowly tailored the statute to further the compelling State interest in protecting the welfare of a child who has experienced a disruption in the family unit from harm. [655-660] COWIN, J., dissenting; SOSMAN, J., dissenting, with whom IRELAND, J., joined.

This court, in applying the so-called strict scrutiny formula, concluded that the Legislature did not offend the principles of equal protection by confining the reach of G. L. c. 119, § 39D, the grandparent visitation statute, to a parent of a nonmarital child born out of wedlock, living apart from the child's other parent. [660-665] SOSMAN, J., dissenting, with whom IRELAND, J., joined.

A complaint filed pursuant to G. L. c. 119, § 39D, the grandparent visitation statute, must be detailed and verified or be accompanied by a detailed and verified affidavit setting out the factual basis relied on by the grandparent to justify relief, or be subject to dismissal (or summary judgment) on motion by the defendant or defendants. [665-666]

CIVIL ACTION commenced in the Plymouth Division of the Probate and Family Court Department on June 5, 2000.

A motion to dismiss was heard by *Catherine P. Sabaitis,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*George P. Lordan, Jr. (Dennis P. Derrick* with him) for John D. Blixt.

---

[1] Paul Sousa.

*Sheila S. Lewinger* for Kristin Blixt.

The following submitted briefs for amici curiae:

*Karen A. Wyle,* of Indiana, for Coalition for the Restoration of Parental Rights.

*Rochelle Bobroff & Michael Schuster,* of the District of Columbia, *& Deborah Banda* for AARP.

*Fern L. Frolin, Martin W. Healy, & Carol A.G. DiMento* for Massachusetts Bar Association.

*Mary L. Bonauto, Jennifer L. Levi, & Karen L. Loewy* for Gay & Lesbian Advocates & Defenders.

*Ronald A. Witmer, Mark I. Berson, & Philip J. Byers* for American Academy of Matrimonial Lawyers, Massachusetts Chapter.

*Christine Durkin & Pauline Quirion* for Greater Boston Legal Services & another.

*David D. Meyer,* of Illinois, *& Thomas J. Carey, Jr.,* pro se.

GREANEY, J. The plaintiff, John D. Blixt, is the maternal grandfather of the minor child of the defendants, a boy born on June 10, 1993. The defendants have never married each other, but the defendant Paul Sousa has been adjudicated the child's father. The child resides with his mother, the defendant Kristin Blixt (mother), and the defendants share legal custody of the child. The plaintiff filed a complaint in the Probate and Family Court seeking visitation with the child under G. L. c. 119, § 39D, the so-called grandparent visitation statute (statute). The statute reads, in pertinent part, as follows:

> "If the parents of an unmarried minor child are divorced, married but living apart, under a temporary order or judgment of separate support, or if either or both parents are deceased, or if said unmarried minor child was born out of wedlock whose paternity has been adjudicated by a court of competent jurisdiction or whose father has signed an acknowledgement of paternity, and the parents do not reside together, the grandparents of such minor child may be granted reasonable visitation rights to the minor child during his minority by the probate and family court department of the trial court upon a written finding that such visitation rights would be in the best interest of the said

minor child; provided, however, that such adjudication of paternity or acknowledgment of paternity shall not be required in order to proceed under this section where maternal grandparents are seeking such visitation rights. No such visitation rights shall be granted if said minor child has been adopted by a person other than a stepparent of such child and any visitation rights granted pursuant to this section prior to such adoption of the said minor child shall be terminated upon such adoption without any further action of the court."

The mother moved, pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), to dismiss the grandfather's complaint on the ground that the statute was unconstitutional on its face because it violated her substantive due process rights under the Fourteenth Amendment to the United States Constitution and cognate provisions of the Massachusetts Declaration of Rights. See *Moe* v. *Secretary of Admin. & Fin.*, 382 Mass. 629, 633 n.4 (1981). She also argued that the statute violated the equal protection provisions of both the Federal and State Constitutions. A judge in the Probate and Family Court, with respect to the mother's due process challenge, concluded that the statute was unconstitutional because it infringed on the defendants' "fundamental right to make decisions concerning the care, custody, and control of their child[]." The judge reasoned that the statute "contains no presumption that [the defendants] are acting in [the child's] best interest in denying visitation, nor . . . a requirement that the [p]laintiff demonstrate how [the child] is harmed by the denial of visitation."[2] The grandfather appealed, and we granted the mother's application for direct appellate review. We conclude that the statute survives a facial challenge on due process grounds and also does not violate equal protection insofar as the mother's statutory classification is concerned.[3] We, therefore, vacate the judgment and remand the case for further proceedings.

1. *Due process.* The mother's claim is to be decided under certain well-established principles governing a facial constitu-

---

[2]This conclusion obviated the need for the judge to reach the mother's challenge to G. L. c. 119, § 39D, on equal protection grounds.

[3]On April 1, 2002, we entered an order directing the parties to file supplemental briefs on the equal protection issue.

tional challenge as well as under the considerations stated by the United States Supreme Court in *Troxel* v. *Granville*, 530 U.S. 57 (2000) (*Troxel*), the only case thus far decided by that Court on Federal due process (but not equal protection) implications of grandparent visitation statutes. We set forth those principles and considerations. The liberty interests of parents protected by the due process clause of the Fourteenth Amendment to the United States Constitution are also protected by our State Constitution. See *McCarthy* v. *Sheriff of Suffolk County*, 366 Mass. 779, 785 (1975). See also *Youmans* v. *Ramos*, 429 Mass. 774, 784 (1999). Our standard of review for such claims, under either the Federal or State Constitution, is the same. See *Take Five Vending, Ltd.* v. *Provincetown*, 415 Mass. 741, 746 n.3 (1993).

(a) A facial challenge to the constitutional validity of a statute is the weakest form of challenge, and the one that is the least likely to succeed. See *United States* v. *Salerno*, 481 U.S. 739, 745 (1987). A statute so questioned is presumed constitutional. See *Landry* v. *Attorney Gen.*, 429 Mass. 336, 343 (1999), cert. denied, 528 U.S. 1073 (2000). A court may interpret a statute to set forth considerations to clarify and specify, and, where necessary, to narrow, the statute's terms in order that it may be held constitutional. See *Commonwealth* v. *Lammi*, 386 Mass. 299, 301 (1982). See also *Kennedy* v. *Commissioner of Corps. & Taxation*, 256 Mass. 426, 430 (1926).

(b) In the *Troxel* case, Justice O'Connor, writing for a plurality of the Court, held that Wash. Rev. Code § 26.10.160 (3) (1994), a nonparental visitation statute under which the plaintiff grandparents sought visitation with their grandchildren, as applied, unconstitutionally infringed on the defendant mother's parental rights protected by Federal due process guarantees.[4] *Troxel, supra* at 60-61, 67. See *Marks* v. *United States*, 430 U.S. 188, 193 (1977), quoting *Gregg* v. *Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, & Stevens, JJ.). The Washington statute provided:

"Any person may petition the court for visitation rights

---

[4]The father of the children, the grandparents' son, had committed suicide. *Troxel* v. *Granville*, 530 U.S. 57, 60 (2000) (*Troxel*).

at any time including, but not limited to, custody
proceedings. The court may order visitation rights for any
person when visitation may serve the best interest of the
child whether or not there has been any change of
circumstances."

*Troxel, supra* at 61, quoting Wash. Rev. Code § 26.10.160 (3).
Noting that the Supreme Court of Washington had failed to nar-
rowly construe the statute, the plurality thought that the statute
was "breathtakingly broad" because its language "effectively
permits any third party seeking visitation to subject any deci-
sion by a parent concerning visitation of the parent's children to
state-court review," and because the statute "contains no
requirement that a court accord the parent's decision any
presumption of validity or any weight whatsoever." *Troxel, su-
pra* at 67. The plurality was disturbed that the statute "places
the best-interest determination solely in the hands of the judge.
Should the judge disagree with the parent's estimation of the
child's best interests, the judge's view necessarily prevails.
Thus, in practical effect, in the State of Washington a court can
disregard and overturn *any* decision by a fit custodial parent
concerning visitation whenever a third party affected by the
decision files a visitation petition, based solely on the judge's
determination of the child's best interests" (emphasis in
original). *Id.*

Highlighting "extensive precedent," the plurality went on to
state, "it cannot now be doubted that the Due Process Clause of
the Fourteenth Amendment protects the fundamental right of
parents to make decisions concerning the care, custody, and
control of their children." *Id.* at 66. The problem with the ap-
plication of the statute by the lower court judge in Washington
was that his decisional framework "directly contravened the
traditional presumption that a fit parent will act in the best inter-
est of his or her child."[5] *Id.* at 69. The judge's approach, the
plurality explained, "failed to provide any protection for [the
mother's] fundamental constitutional right to make decisions
concerning the rearing of her own daughters." *Id.* at 70. The

---

[5]There had been no allegation or finding that the mother was unfit, yet the
judge improperly placed on her "the burden of *disproving* that visitation
would be in the best interest of her daughters" (emphasis in original). *Troxel,
supra* at 69.

plurality emphasized that "the decision whether such an inter-generational relationship would be beneficial in any specific case is for the parent to make in the first instance. And, if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court *must* accord at least some special weight to the parent's own determination" (emphasis added). *Id.*

The plurality was troubled not only with the judge's failure to give any special weight to the mother's decision concerning visitation, but also with the judge's "slender findings,"[6] "announced presumption in favor of grandparent visitation,"[7] and "failure to accord significant weight to [the mother's] already having offered meaningful visitation to the [grandparents]."[8] *Id.* at 72. The judge's approach to awarding visitation, the plurality stated, "show[s] that this case involves nothing more than a simple disagreement between the Washington Superior Court and [the mother] concerning her children's best interests." *Id.* The plurality concluded that "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Id.* at 72-73.

Importantly, however, the plurality expressly declined to foreclose the States from enacting grandparent visitation statutes. *Id.* at 73. This restraint, of course, is not surprising in view of the following statement by Justice O'Connor, writing for the plurality, that sums up today's family structures:

"The demographic changes of the past century make it

---

[6]The judge made only the two following findings. First, that the grandparents "are part of a large, central, loving family, all located in this area, and the [grandparents] can provide opportunities for the children in the areas of cousins and music," and, second, that "[t]he children would be benefitted from spending quality time with the [grandparents], provided that that time is balanced with time with the childrens' [*sic*] nuclear family." *Id.* at 72.

[7]The judge referred to his "enjoyable [childhood] experience" of spending one week during the summer with each set of his grandparents. *Id.* at 72.

[8]There was "no allegation that [the mother] ever sought to cut off visitation entirely." *Id.* at 71. The plurality noted that some State statutes do not permit a visitation award unless a parent has denied or unreasonably denied visitation to the third party. *Id.* at 71-72, citing Miss. Code. Ann. § 93-16-3 (2)(a) (1994); Ore. Rev. Stat. § 109.121 (1)(a)(B) (1997); R.I. Gen. Laws §§ 15-5-24.3 (a) (2) (iii)-(iv) (Supp. 1999).

difficult to speak of an average American family. The composition of families varies greatly from household to household. While many children may have two married parents and grandparents who visit regularly, many other children are raised in single-parent households. In 1996, children living with only one parent accounted for 28 percent of all children under age 18 in the United States. . . . Understandably, in these single-parent households, persons outside the nuclear family are called upon with increasing frequency to assist in the everyday tasks of child rearing. In many cases, grandparents play an important role. For example, in 1998, approximately 4 million children — or 5.6 percent of all children under age 18 — lived in the household of their grandparents." (Citations omitted.)

*Id.* at 63-64. In recognition, in part, of this situation, all fifty States have enacted statutes authorizing some form of grandparent visitation.[9] *Id.* at 73 & n.*.

What clearly emerges from the plurality decision in *Troxel*, with respect to due process, are the following principles:

(i) reaffirmation that a parent's liberty interest in child rearing is indeed fundamental, and is certainly fundamental in this context, see *Troxel, supra* at 66;

(ii) "any third party" should not be permitted to seek visitation, see *id.* at 67;

(iii) in determining whether grandparent visitation should occur, there exists a "presumption that a fit parent will act in the best interest of his or her child," *id.* at 69, and the decision of a fit parent concerning grandparent visitation is entitled to considerable deference, contrast *id.* at 67; and

(iv) in determining whether grandparent visitation should occur, the potential impact to the parent-child relationship should be considered, see *id.* at 70.

(c) When a fundamental right is at stake, the so-called "strict scrutiny" formula for examining the constitutionality of State

---

[9]The statutes vary considerably and it would not be helpful to this opinion to list them and to describe their variations. See Bobroff, The Survival of Grandparent Visitation Statutes, 34 Clearinghouse Rev. 284, 287-288 (2000).

infringement on that right comes into play. See *Aime* v. *Commonwealth*, 414 Mass. 667, 673 (1993). This formula traditionally is stated in terms of requiring (1) a legitimate and compelling State interest to justify State action, and (2) careful examination to ascertain whether the action taken was "narrowly tailored to further [that] interest." *Id.* The *Troxel* case recognized that a third-party visitation statute implicates the fundamental right of parents to make decisions concerning the care, custody, and control of their children, see *Troxel, supra* at 66. The plurality stated that, given the fundamental nature of the parental rights at issue, a State grandparent visitation statute, to be held valid, must furnish the judge applying it with sufficient objective criteria to make reasonable decisions based on facts, not idiosyncratic choices based on undefined amorphous standards. See *Troxel, supra* at 73.

The plurality's approach in the *Troxel* case has also been used in our jurisprudence. See *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 832, cert. denied, 528 U.S. 1005 (1999); *Opinion of the Justices*, 427 Mass. 1201, 1203 (1998). It cannot be disputed that the State has a compelling interest to protect children from actual or potential harm. See *Prince* v. *Massachusetts*, 321 U.S. 158, 167 (1944); *Matter of McCauley*, 409 Mass. 134, 136 (1991). This interest is expressed in a variety of statutes and proceedings, ranging from the complete severance of parental rights on a judge's finding of parental unfitness,[10] to the limitation of parental choices in the areas, for example, of education,[11] health care,[12] and safety.[13] As we shall explain more fully below, the statute can be interpreted to require a showing of harm to the child if visitation is not allowed. So interpreted, the

---

[10]See G. L. c. 119, §§ 23-29 (care and protection statute); G. L. c. 210, § 3 (adoption statute); G. L. c. 201, § 5 (guardianship statute). See *Custody of a Minor*, 389 Mass. 755, 765 (1983) ("parents' right to custody is not absolute, and it must yield to the welfare of the child").

[11]See, e.g., G. L. c. 76, §§ 1-2 (compulsory school attendance law). See also *Commonwealth* v. *Renfrew*, 332 Mass. 492, 494 (1955).

[12]See, e.g., G. L. c. 76, § 15 (compulsory child vaccination law). See also *Matter of McCauley*, 409 Mass. 134, 136 (1991) (concluding that best interests of child, and strong interests of State over child's welfare, outweighed parents' rights, grounded on religion, to refuse blood transfusions for child).

[13]See, e.g., G. L. c. 90, § 7AA (requiring children under age of five years and children weighing forty pounds or less to be secured by "child pas-

statute furthers a compelling and legitimate State interest in mitigating potential harm to children in nonintact families, an area in which the State has been traditionally and actively involved.

(d) We now turn to the scope of the statute. Contrary to the Washington statute under review in the *Troxel* case, which the plurality found to be "breathtakingly broad," *Troxel, supra* at 67, the Massachusetts statute, enacted before the *Troxel* decision, itself limits standing to seek visitation to grandparents in certain classes and circumstances. The mother readily acknowledges that the statute is not as broad as the Washington statute reviewed in the *Troxel* case, but she argues nonetheless that it cannot withstand any measure of constitutional scrutiny. We reject the mother's argument.

The statute adopts the "best interests of the child" standard as the test for determining visitation. This standard has long been used in Massachusetts to decide issues of custody and visitation and other issues relating to child welfare. The statute, however, uses the standard in a new context, and, based on the reasoning in the *Troxel* case, the standard, left unspecified, cannot survive a due process challenge. The interpretive role of an appellate court now comes into play. As we have mentioned, an appellate court may, in an appropriate case, construe a statute to render it constitutional. See, e.g., *Yannas* v. *Frondistou-Yannas*, 395 Mass. 704, 710-712 (1985) (discussing relevant factors bearing on "best interests" of children that must be considered when evaluating parent's motion to remove child from Commonwealth pursuant to G. L. c. 208, § 30, despite absence of specifically enumerated standard or factors in statute). We conclude that, operating with the guidance of the *Troxel* case and our case law in related areas, and law from other jurisdictions, the traditional best interests considerations (of which the Legislature is presumed to have been aware when it enacted the statute) can, and should, be construed to fit the statute's context and, thereby, satisfy due process.

To accord with due process, an evaluation of the best interests of the child under the statute requires that a parental decision

senger restraint" in motor vehicle, and requiring children between ages of five and twelve years to wear safety belts while riding in motor vehicles).

concerning grandparent visitation be given presumptive validity. See *Troxel, supra* at 69.[14] This requirement is of paramount importance because the best interests of children and fundamental parental autonomy rights traditionally are "cognate and connected." *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 591 (1981), quoting *Bezio* v. *Patenaude*, 381 Mass. 563, 571 (1980). As Justice O'Connor explained, quoting *Parham* v. *J.R.*, 442 U.S. 584, 602 (1979):

> "The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children."

*Troxel, supra* at 68. To obtain visitation, the grandparents must rebut the presumption. The burden of proof will lie with them to establish, by a preponderance of the credible evidence, that a decision by the judge to deny visitation is not in the best interests of the child. More specifically, to succeed, the grandparents must allege and prove that the failure to grant visitation will cause the child significant harm by adversely affecting the child's health, safety, or welfare. The requirement of significant harm presupposes proof of a showing of a significant preexisting relationship between the grandparent and the child. In the absence of such a relationship, the grandparent must prove that visitation between grandparent and child is nevertheless necessary to protect the child from significant harm. Imposition of the standards just stated, as explained in specific written findings by the judge, see *Guardianship of Norman*, 41 Mass. App. Ct. 402, 407 (1996), ensures a careful balance between the possibly conflicting rights of parents in securing their parental autonomy, and the best interests of children in avoiding actual harm to their well-being.

These standards do not require de facto parental status on the part of the grandparents, but the standards are consistent with our cases concerning de facto parents. These cases recognize

[14]The presumption of valid parental decision-making necessarily requires application of a presumption that the parent is fit.

that disruption of a child's preexisting relationship with a non-biological parent can be potentially harmful to the child, and they hold that such a relationship may be protected by court-ordered visitation with a nonparent over a fit parent's objection. See *E.N.O.* v. *L.M.M.*, *supra* at 834, 830 (concluding that judge properly allowed de facto parent's motion for temporary visitation with child and, in considering motion, properly considered whether such visitation would be in child's best interests); *Youmans* v. *Ramos*, 429 Mass. 774, 782-783 (1999) (concluding that judge may order visitation between child and maternal aunt who was child's de facto parent after considering best interests of child).[15] The standards we have established are also consistent with considerable authority elsewhere concerning the issue of grandparent visitation.[16]

---

[15]One definition of the term "de facto parent" is: "A *de facto parent* is an individual other than a legal parent or a parent by estoppel who, for a significant period of time not less than two years, (i) lived with the child and, (ii) for reasons primarily other than financial compensation, and with the agreement of a legal parent to form a parent-child relationship, or as a result of a complete failure or inability of any legal parent to perform caretaking functions, (A) regularly performed a majority of the caretaking functions for the child, or (B) regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived." ALI Principles of the Law of Family Dissolution § 2.03 (c) (Tent. Draft No. 4 2000).

[16]See *Linder* v. *Linder*, 348 Ark. 322, 352 (2002) (requiring "some other special factor such as harm to the child or custodial unfitness that justifies [S]tate interference"); *Roth* v. *Weston*, 259 Conn. 202, 229 (2002) ("[State] interference [with parental decisions] is justified only when it can be demonstrated that there is a compelling need to protect the child from harm. In the absence of a threshold requirement of a finding of real and substantial harm to the child as a result of the denial of visitation, forced intervention by a third party seeking visitation is an unwarranted intrusion into family autonomy"); *Von Eiff* v. *Azicri*, 720 So. 2d 510, 514 (Fla. 1998) ("Neither the legislature nor the courts may properly intervene in parental decisionmaking absent significant harm to the child threatened by or resulting from those decisions"); *Brooks* v. *Parkerson*, 265 Ga. 189, 193, 194, cert. denied, 516 U.S. 942 (1995) (because "[S]tate interference with parental rights to custody and control of children is permissible only where the health or welfare of a child is threatened," State may not order grandparent visitation absent "a showing that failing to do so would be harmful to the child"); *Wickham* v. *Byrne*, 199 Ill. 2d 309, 317 (2002) (interference in parent's decision may only occur "when the health, safety, or welfare of a child is at risk"); *Neal* v. *Lee*, 14 P.3d 547, 550 (Okla. 2000) (visitation order unconstitutional "absent a showing of harm" to child); *Hawk* v. *Hawk*, 855 S.W.2d 573, 577, 579 (Tenn. 1993) ("when no substantial harm threatens a child's welfare, the [S]tate

We conclude, in rejection of the facial due process challenge made by the mother, that the statute satisfies strict scrutiny because our construction narrowly tailors it to further the compelling State interest in protecting the welfare of a child who has experienced a disruption in the family unit from harm.

2. *Equal protection.* The mother claims that the statute violates equal protection because its classifications impermissibly burden parents of "non-traditional families" with litigation affecting their parental decisions. She correctly states that the statute does not apply to grandparents of a minor child whose parents are living together. The mother maintains that "[t]here are no distinguishing characteristics of widowed, divorced or otherwise single parents relevant to any interest of the [S]tate in promoting grandparent visitation under any standard of review." Essentially, the mother argues that the statute is both "underinclusive," because it does not burden biological parents of minor children who are living together at the time the petition is filed, and "overinclusive," because it burdens a single parent, or any two parents living separately, but who are, nonetheless, fully capable of making decisions in their children's best interest.

(a) Because the statute's classifications implicate fundamental parental rights, "strict scrutiny" analysis is again appropriate to evaluate the mother's equal protection challenge. See *English* v. *New England Med. Ctr., Inc.*, 405 Mass. 423, 428 (1989), cert. denied, 493 U.S. 1056 (1990); *Paro* v. *Longwood Hosp.*, 373

---

lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit"); *Williams* v. *Williams*, 256 Va. 19, 21-22 (1998) (visitation statute constitutional because "court reaches consideration of the 'best interest' standard in determining visitation only after it finds harm if visitation is not ordered"). See also *Roth* v. *Weston*, *supra* at 226 ("proof of a close and substantial relationship [with party seeking visitation] and significant harm should visitation be denied are, in effect, two sides of the same coin"); *Skov* v. *Wicker*, 32 P.3d 1122, 1126-1127 (Kan. 2001) (to uphold constitutionality of grandparent visitation statute, court added requirement that grandparent prove existence of "a substantial relationship with the grandchildren"); *Rideout* v. *Riendeau*, 761 A.2d 291, 301 (Me. 2000) (because "cessation of contact with a grandparent whom the child views as a parent may have a dramatic, and even traumatic, effect upon the child's well-being," there is compelling State interest in protecting "child's significant need to be assured that he or she will not unnecessarily lose contact with a grandparent who has been a parent to that child").

Mass. 645, 649 & n.6 (1977). Under this analysis, a statutory classification is permissible if it "furthers a demonstrably compelling interest of the State and limits its impact as narrowly as possible consistent with the purpose of the classification." *Opinion of the Justices,* 374 Mass. 836, 838 (1977).[17]

(b) We review the validity of the statute on equal protection grounds only as it pertains to the class in which the mother belongs, that is, a parent of a nonmarital child born out of wedlock, living apart from the child's other parent, in this case, the child's father.[18] There is no reason in this case to depart from the established rule, followed both in Massachusetts and Federal courts, that, "[o]rdinarily one may not claim standing . . . to vindicate the constitutional rights of some third party." *Slama* v. *Attorney Gen.,* 384 Mass. 620, 624 (1981), quoting *Barrows* v. *Jackson,* 346 U.S. 249, 255 (1953). See *New York* v. *Ferber,* 458 U.S. 747, 767-768 & n.20 (1982); *United States* v. *Raines,* 362 U.S. 17, 21 (1960). Stated somewhat differently in *Massachusetts Comm'n Against Discrimination* v. *Colangelo,* 344 Mass. 387, 390 (1962), "[o]nly one whose rights are impaired by a statute can raise the question of its constitutionality, *and he can object to the statute only as applied to him*" (emphasis added). See *Broadhurst* v. *Fall River,* 278 Mass. 167, 170 (1932). See also *Cleburne* v. *Cleburne Living Ctr., Inc.,* 473 U.S. 432, 437 (1985) ("to avoid making unnecessarily broad constitutional judgments," "preferred course" should be inquiry concerning statute as applied). Contrary to the rationale of the dissent of Justice Sosman, there is no exception to these rules governing standing permitting challenges to certain classifications if those classifications happen to share one particular characteristic, here, parents living apart. The other classifications in the statute contain characteristics that do not apply to the mother: she is not divorced, she is not married, she is not a

---

[17]The standard for evaluating equal protection challenges under our State Constitution is the same as the standard under the Federal Constitution. See *Chebacco Liquor Mart, Inc.* v. *Alcoholic Beverages Control Comm'n,* 429 Mass. 721, 723 (1999); *Tobin's Case,* 424 Mass. 250, 252 (1997); *Commonwealth* v. *Franklin Fruit Co.,* 388 Mass. 228, 235 (1983).

[18]The mother does not challenge the paternity requirement in the classification.

widow. Those classifications raise different characteristics and different issues that may be challenged only by persons who are members of those classes. It is inappropriate for us to examine them, and Justice Sosman's dissent does so in a diffused, scattershot effort to invalidate the statute on any basis.[19]

(c) Although it does not address equal protection concerns, the *Troxel* decision instructs us that it may be constitutionally permissible for a State to authorize court-ordered visitation in some situations, and not in others, as long as the visitation is ordered in carefully limited circumstances. See *id.* at 67, 73. Classifications within statutes authorizing some form of grandparent visitation grant standing depending on, in some States, the existence of a preexisting relationship with the child[20] or, the domestic situation of the child's parents.[21] The mother asserts that classifications based on the living arrangements of a child's parents unfairly intrude into the lives of single parents, such as herself, and constitute "an outmoded notion of their capabilities as parents."[22]

However, the mother mistakes the focus of our grandparent

---

[19]Curiously, while Justice Sosman's dissent mistakenly states that the statute's classifications are "predicated entirely on the parents' living arrangements," *post* at 680 (Sosman, J., dissenting), the dissent then goes on to discuss the circumstances of, and acknowledge, the particular characteristics (those different from living arrangements) of the classifications to which the mother does not belong.

[20]See, e.g., Cal. Fam. Code § 3104 (a)(1) (Deering 1994); Iowa Code Ann. § 598.35 (7) (West 2001); Kan. Stat. Ann. § 38-129 (a) (2000); Wash. Rev. Code Ann. § 26.09.240 (5)(a) (West 1997) (standing to petition for visitation accorded to grandparent with significant relationship to child).

[21]This approach is one taken by a large number of States. Bobroff, The Survival of Grandparent Visitation Statutes, 34 Clearinghouse Rev. 284, 287 & n.16 (2000). See, e.g., Ariz. Rev. Stat. Ann. § 25-409 (A) (1) and (2) (West 2000) (when marriage of child's parents dissolved, or one parent deceased or missing, for three months); Ark. Code Ann. § 9-13-103 (a)(1)(A) (LexisNexis 2002) (when marital relationship between parents severed by death, divorce, or legal separation); Fla. Stat. Ann. § 752.01 (1) (West Supp. 2002) (when marriage of parents of child dissolved, one parent has deserted child, or child born out of wedlock); N.H. Rev. Stat. Ann. § 458:17-d (1992) (when child's nuclear family is subject of "divorce, death, relinquishment or termination of parental rights" [unless grandparent's access to child earlier, or contemporaneously, restricted], *O'Brien* v. *O'Brien*, 141 N.H. 435, 437 [1996]).

[22]We appreciate this concern but do not consider it dispositive. The United States Supreme Court has recognized that social consensus about family relationships is relevant to the constitutional limits on State intervention. See

visitation statute. The statute's intent, as we have stated, is not to penalize parents but to safeguard children. Cf. G. L. c. 119, § 1 (stating Commonwealth's policy "to provide substitute care of children only when the family itself or the resources available to the family are unable to provide the necessary care and protection to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development"); *Custody of a Minor*, 389 Mass. 755, 767-768 (1983) (in care and protection proceeding pursuant to G. L. c. 119, § 24, purpose of court's inquiry must be directed to protecting children from actual harm and not to penalizing parents). Hardly a more compelling State interest exists than to keep children safe from the kinds of physical or emotional trauma that may scar a child's "health and . . . physical, mental, spiritual and moral development" well into adulthood.

The Legislature has long recognized, as it may, consistent with our Federal and State Constitutions, that children whose parents are unmarried and live apart may be at heightened risk for certain kinds of harm when compared with children of so-called intact families. See, e.g., G. L. c. 209C, § 9 (court may issue support orders protecting rights of nonmarital children to, among other things, parental financial support and adequate health insurance). That children whose unmarried parents live apart may be especially vulnerable to real harm from the loss or absence of a grandparent's significant presence is a permissible legislative conclusion, drawn from social experience and consistent with the State's compelling interest in protecting minors from harm. As *Troxel* recognizes, studies show that, in the over one-quarter of households in which children are raised by single parents, grandparents may play an increasingly important role in child rearing, *Troxel, supra* at 63-64. Thus,

*Zablocki* v. *Redhail*, 434 U.S. 374, 395 (1978); *Moore* v. *East Cleveland*, 431 U.S. 494, 496 (1977); *Belle Terre* v. *Boraas*, 416 U.S. 1, 2, 8-9 (1974). Given the continual reinterpretation of the notion of "family," and of who may be a "parent," constitutional jurisprudence in this area is not easily applied, particularly to persons defined by status. See Dolgin, The Constitution as Family Arbiter: A Moral in the Mess?, 102 Colum. L. Rev. 337, 405 (2002). To that end, the dissent assumes that gay and lesbian couples would not be considered "parents" under the statute. While G. L. c. 119, § 21, defines the term "parent" as meaning "mother or father," those terms are not defined, and we need not define them in this case.

grandparents may play an increasingly important role in a child's development. This important role, when it does develop, does not arise by accident, but by a parent's deliberate choice to invite the grandparent into the family fold, and to permit (or encourage) a bond between grandparent and grandchild that may then become crucial to the child's physical or emotional security. In such situations, the State's intervention may be necessary to secure the child's well-being from traumatic separation from the grandparent. Such intervention has nothing to do with appeasing a grandparent's hurt feelings, castigating a parent's lifestyle, or perpetuating an illusion of family unity. It has everything to do with protecting the child, insofar as possible, by preserving the fruits of significant developmental attachment whose seeds were planted by a parent. Cf. *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 833 (1999) (where defendant encouraged plaintiff to become child's de facto parent and such relationship was formed between child and plaintiff, "defendant's parental rights do not extend to the extinguishment of the child's relationship with the plaintiff").

Moreover, the Legislature may, within its narrow field of action under our equal protection guarantees, presume that the burden of the traumatic loss of a grandparent's significant presence may fall most heavily on the child whose unmarried parents live apart and who may not have or be able to draw on the resources of two parents in coping with his or her loss. Such a child may already be vulnerable to the feelings of loss, inadequacy, and insecurity that our society still often visits on those children whose family structure departs from an idealized two-parent norm. This is not to say that every child whose parents are unmarried and live apart is particularly vulnerable to the harm of a grandparent's absence, or that every child in a two-parent household will be shielded from such harm. We merely hold that the Legislature does not offend the principles of equal protection, as seen through the narrow lens of strict scrutiny, by confining the reach of the grandparent visitation statute, as we construe it today, to a discrete class of children within the discrete class of households at issue.

Justice Sosman's dissent seeks to conjure up circumstances of family disruption in the statute's classifications, and then

concludes that the disruption should not affect parental rights. For example, her dissent points to circumstances where divorced parents might *agree* that visitation with a particular grandparent is undesirable. Such a situation is not unlike the one presented in this case, in which both parents, though never married and living apart,[23] do not want the requested visitation to occur. These considerations, however, become relevant *after* the threshold issue of standing is satisfied. They are matters that are relevant to an as-applied analysis, but not to a facial equal protection challenge. In addition, the plethora of hypothetical situations concocted in her dissent's ad terrorem approach discloses that the dissent has completely ignored the harm requirement — the State will not intrude into a nonintact family in the absence of a showing of significant harm. None of the situations conjured up by the dissent involves a situation where there is actual harm to the child. Again, the dissent attempts to invalidate the statute on any ground it possibly can contrary to our duty to uphold the statute. Because the classification narrows the impact of the statute, while furthering a compelling State interest, it survives an equal protection challenge. The dissent ignores this important, and ultimately decisive, consideration.[24]

3. *Pleading requirements under statute.* There is one other matter with respect to the statute that needs to be addressed. A complaint under the statute for grandparent visitation is brought under the rules of civil procedure.[25] The complaint is essentially notice pleading, as was the grandfather's complaint, which simply asked for "visitation." As recognized by the plurality in

---

[23]The record reflects that the mother and father, with the child, lived together for approximately one and one-half years after the child's birth.

[24]It is important as well that procedural requirements, to be discussed in Part 3 of this opinion, ensure that a parent is not subjected to a full hearing merely because he or she falls within the scope of the statute's reach. The statute merely affords a grandparent the opportunity to produce evidence that circumstances are severe enough to warrant a court's review of the parent's decision to deny visitation. Further, by establishing the presumption of valid parental decision-making, and by adopting a best interest of the child standard that incorporates a significant harm requirement, the statute ensures that *both* interests, that of parent and child, will be safeguarded.

[25]The Massachusetts Rules of Domestic Relations Procedure do not apply to complaints for grandparent visitation. See Mass. R. Dom. Rel. P. 1 (2002).

the *Troxel* case, "the burden of litigating a domestic relations proceeding can itself be 'so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated.' " *Troxel, supra* at 75, quoting *id.* at 101 (Kennedy, J., dissenting). Notice pleading does not safeguard these concerns.

Before a parent or parents are called upon to litigate fully a grandparent visitation complaint, with all the attendant stress and expense, the grandparent or grandparents should make an initial showing that satisfies a judge that the burden of proof, set forth above, can be met. To this end, any complaint filed under the statute should be detailed and verified or be accompanied by a detailed and verified affidavit setting out the factual basis relied on by the plaintiffs to justify relief.[26] A complaint not so verified, or one accompanied by an inadequate affidavit, would be subject to dismissal (or summary judgment) on motion by the defendant or defendants. This procedure should minimize the burden placed on a parent or parents to defend against unwarranted actions.

*4. Remand.* The present case was dealt with by the judge on a motion to dismiss. We have concluded that the action should not have been dismissed. There is pending a request for summary judgment, and affidavits and other materials are in the record dealing with the question of summary judgment. The judge may choose to deal with the case on the summary judgment record after allowing the parties a reasonable opportunity to file additional materials. The judge may also take any other action necessary or appropriate to decide the case. The judgment dismissing the complaint is vacated, and the case is to stand for further proceedings in the Probate and Family Court consistent with this opinion.

*So ordered.*

Cowin, J. (dissenting in part). I join with that portion of Justice Sosman's dissent that would declare the statute

---

[26]The standard form now apparently in use in the Probate and Family Court will need to be revised to reflect the standards we have enunciated.

unconstitutional on its face because it infringes on parents' fundamental right to make decisions concerning the upbringing of their children. In that regard, I agree with Justice Sosman (a) that the statute violates due process guarantees because its substantive provisions fail to satisfy the requirement that they be narrowly tailored to serve a compelling State interest; and (b) that the court has impermissibly rewritten the statute in an effort to make it comply with due process requirements.

Because the court has determined that the statute ("as rewritten") satisfies due process requirements, it considers the validity of the statute on equal protection grounds "as it pertains to the class in which the mother belongs, that is, a parent of a non-marital child born out of wedlock, living apart from the child's other parent, in this case, the child's father." *Ante* at 661. I agree with this portion of the court's opinion that concludes that "the Legislature does not offend the principles of equal protection, as seen through the narrow lens of strict scrutiny, by confining the reach of the grandparent's visitation statute, as [the court] construe[s] it today, to a discrete class of children within the discrete class of households at issue." *Ante* at 664.

SOSMAN, J. (dissenting, with whom Ireland, J., joins). The grandparent visitation statute at issue in today's opinion, G. L. c. 119, § 39D, infringes on parents' fundamental right to make decisions concerning the upbringing of their children. It also creates classifications of parents, subjecting some of them to State interference in parental decision-making while leaving others free of such interference. As drafted, the statute violates both due process and equal protection guarantees, as neither its substantive provisions nor its classifications satisfy the requirement that they be narrowly tailored to serve a compelling State interest. Recognizing that the statute as drafted cannot withstand strict scrutiny, the court has simply substituted for the statute's actual provisions a general statement articulating the minimum constitutional requirements for such a statute and, for good measure, invented a special rule of pleading for grandparent visitation cases. This overhaul of the statute cannot be justified as mere "interpretation." Where, as here, the statute is

unconstitutional on its face, it is our job to say so and to let the Legislature rewrite the statute if and as it wishes.

The court also opts to sidestep many of the equal protection problems posed by the statute's classifications, focusing in isolation on the classification into which these parents fall, despite the fact that all of the classifications are predicated on a single requirement, i.e., that the child's biological parents are not presently living together. As to the classification encompassing these particular parents, the court mistakenly assumes that that classification is narrower than what the statute actually provides, and then resorts to vague stereotypes to justify the classification it has misdescribed. The equal protection analysis applied today resembles the "rational basis" test, not the test of "strict scrutiny" that is to be applied to statutes that implicate fundamental liberty interests. I therefore dissent.

1. *Substantive due process.* The court acknowledges, as it must, that a statute impinging on parental decision-making implicates a fundamental right. *Ante* at 655. "The liberty interest at issue in this case — the interest of parents in the care, custody, and control of their children — is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel* v. *Granville*, 530 U.S. 57, 65 (2000) (*Troxel*). "Where a right deemed to be 'fundamental' is involved, courts 'must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation,' . . . and typically will uphold only those statutes that are narrowly tailored to further a legitimate and compelling governmental interest." *Aime* v. *Commonwealth*, 414 Mass. 667, 673 (1993), quoting *Moore* v. *East Cleveland*, 431 U.S. 494, 499 (1977). "Under our free and constitutional government, it is only under serious provocation that we permit interference by the State with parental rights." *Custody of a Minor (No. 3)*, 378 Mass. 732, 749 (1979). "Parental rights to raise one's children are essential, basic rights that are constitutionally protected," and, therefore, "State intrusion in the rearing of children by their parents may be justified only in limited circumstances." *Adoption of Vito*, 431 Mass. 550, 562, 563 (2000).

a. *Compelling State interest.* The State's interest in "protecting the well-being of children" qualifies as a compelling State interest. *Matter of McCauley,* 409 Mass. 134, 137 (1991). See *Prince* v. *Massachusetts,* 321 U.S. 158, 166 (1944). The State's legitimate and compelling interest in the welfare of children, however, does not encompass all things that might be beneficial to children and does not confer on the State a power to mandate, over the objection of a fit, competent parent, anything that might be viewed as desirable for young people. Rather, in context, what has been recognized within the sphere of a compelling State interest to protect the "well-being of children" is an interest to prevent injury, abuse, trauma, exploitation, severe deprivation, and other comparable forms of significant harm. See *id.* at 168 (restrictions on child labor could constitutionally be enforced against parent to prevent "the crippling effects of child employment"); *Matter of McCauley, supra* at 138 (court-ordered blood transfusion to avert "certain death" of child); *Opinion of the Justices,* 427 Mass. 1201, 1208-1209 (1998) (upholding rebuttable presumption in custody disputes that child not be placed with abusive parent). The United States Supreme Court has also identified compulsory education and compulsory vaccination as examples of other types of requirements the State may impose against a parent's wishes. *Prince* v. *Massachusetts, supra* at 166. "[T]he power of the parent, even when linked to a free exercise claim, may be subject to limitation under *Prince* if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Wisconsin* v. *Yoder,* 406 U.S. 205, 233-234 (1972). See *Pierce* v. *Society of Sisters,* 268 U.S. 510, 534 (1925) (State could not countermand parents' decision to send children to private school because those decisions were "not inherently harmful" to child).

Thus, the State has a compelling interest in protecting children from significant deprivation, injury, or harm. It does not have a compelling interest in supervising a child's upbringing merely because it thinks it can do a better job than the child's parents. "[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Troxel, supra* at 72-73.

"[M]ere improvement in quality of life is not a compelling state interest and is insufficient to justify invasion of constitutional rights. So long as a family satisfies certain minimum standards with respect to the care of its children, the state has no interest in attempting to 'make things better.' " *King* v. *King*, 828 S.W.2d 630, 634 (Ky.), cert. denied, 506 U.S. 941 (1992) (Lambert, J., dissenting).

Healthy relationships with grandparents are unquestionably of benefit to children. That such relationships are good for children does not allow the State to force such relationships on them contrary to the wishes of their parents. "[A] vague generalization about the positive influence many grandparents have upon their grandchildren falls far short of the necessary showing of harm which would warrant the state's interference with this parental decision regarding who may see a child." *Matter of Herbst*, 971 P.2d 395, 399 (Okla. 1998). Like many other things in the vast array of beneficial associations, activities, and resources that might be desirable for children, their fit parents — not the State — are the ones to choose which will be best for them. "There may be many beneficial relationships for a child, but it is not for the government to decide with whom the child builds these relationships." *Von Eiff* v. *Azicri*, 720 So. 2d 510, 516 (Fla. 1998).

Of course, when something is *necessary* to a child's "well-being," the State may intervene to make sure that the child is not deprived of that necessity. See, e.g., *Custody of a Minor (No. 3)*, 378 Mass. 732 (1979) (medical treatment of child's leukemia). Grandparents, as wonderful as they are, are not a necessity. Children can and do grow up to be healthy, stable, productive members of society without them. Depriving children of relationships with their grandparents is not the equivalent of depriving them of health care, food, shelter, security, or a basic education. See *Santi* v. *Santi*, 633 N.W.2d 312, 318 (Iowa 2001) (no compelling State interest served by grandparent visitation statute, noting that "the case before us is not about car seats or vaccinations").

*Troxel* has not expanded the scope of compelling State interests in this area. Because the Court was able to resolve *Troxel* on the ground that the visitation statute at issue had been

unconstitutionally applied, it did *"not consider . . .* whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation" (emphasis added). *Troxel, supra* at 73. Given the wide variety of visitation statutes across the country, with varying standing requirements and differing substantive provisions, the Court was understandably reluctant to make broad pronouncements on this sensitive subject when such pronouncements did not have to be made. Similarly, in the absence of any showing even resembling "harm" on the record presented, the Court had no occasion to expound on what forms of "harm" might justify State interference in parents' decisions concerning visitation, preferring to leave open the possibility that States might be able to identify compelling interests in this area that might not fit squarely within the conventional meaning of "harm to the child."

Notwithstanding such reticence in *Troxel,* many State courts considering visitation statutes have held that State interference in parental decisions cannot be justified in the absence of harm to the child or a showing of parental unfitness. "[A]lthough the plurality in *Troxel* avoided the issue, its prior decisions clearly reflect a tolerance for interference with parental decisions only when the health or safety of the child will be jeopardized or there exists the potential for significant social burdens." *Roth* v. *Weston,* 259 Conn. 202, 228 (2002). "Consequently, interference is justified only when it can be demonstrated that there is a compelling need to protect the child from harm. In the absence of a threshold requirement of a finding of real and substantial harm to the child as a result of the denial of visitation, forced intervention by a third party seeking visitation is an unwarranted intrusion into family autonomy." *Id.* at 229.

Consistent with considerable precedent from other States, both pre- and post-*Troxel,* today's decision appropriately recognizes that visitation orders would be unconstitutional absent a showing of significant harm to the child. *Ante* at 658, 659 n.16.[1] See *Linder* v. *Linder,* 348 Ark. 322, 352 (2002); *Roth* v. *Weston, supra* at 205-206; *Von Eiff* v. *Azicri,* 720 So. 2d 510,

---

[1]Today's opinion does not seek to justify the visitation statute on the ground that it protects any "right" of grandparents. Grandparents have no

514 (Fla. 1998); *Beagle* v. *Beagle*, 678 So. 2d 1271, 1276 (Fla. 1996); *Brooks* v. *Parkerson*, 265 Ga. 189, 193, 194, cert. denied, 516 U.S. 942 (1995); *Wickham* v. *Byrne*, 199 Ill. 2d 309, 317 (2002); *Neal* v. *Lee*, 14 P.3d 547, 550 (Okla. 2000); *Matter of Herbst*, 971 P.2d 395, 398 (Okla. 1998); *Hawk* v. *Hawk*, 855 S.W.2d 573, 577, 579 (Tenn. 1993); *Williams* v. *Williams*, 256 Va. 19, 21-22 (1998).

However, our grandparent visitation statute, as drafted, allows a judge to order visitation, over a fit parent's objection, whenever the judge concludes that such visitation would be "in the best interest" of the child. G. L. c. 119, § 39D. Mere invocation of the child's "best interest" does not, by itself, amount to a compelling State interest, and *Troxel* expressly held that that "best interest" standard, standing alone, would not pass constitutional muster. See *Troxel, supra* at 67-68 (court cannot overturn parent's decision "based solely on the judge's determination of the child's best interests"); *Wickham* v. *Byrne, supra* at 320-321 (visitation statute premised on judicial determination of "the best interests and welfare of the child" unconstitutional on its face); *DeRose* v. *DeRose*, 249 Mich. App. 388, 394-395 (2002) (visitation statute premised on "best interests of the child" standard is unconstitutional on its face); *Rideout* v. *Riendeau*, 761 A.2d 291, 301 (Me. 2000) ("something more than the best interest of the child must be at stake in order to establish a compelling state interest").

As drafted, our grandparent visitation statute allows a judge to determine a child's "best interest" and, predicated solely on that determination, to countermand the decision of the child's fit, competent parents. The statute operates on the simple but erroneous assumption that judges are best equipped to resolve

constitutional "right" to visit their grandchildren, nor was any such "right" recognized at common law. See *Troxel* v. *Granville*, 530 U.S. 57, 97 (2000) (Kennedy, J., dissenting), and cases cited; *Linder* v. *Linder*, 348 Ark. 322, 348 (2002); *Von Eiff* v. *Azicri*, 720 So. 2d 510, 511 (Fla. 1998), and cases cited; *Rideout* v. *Riendeau*, 761 A.2d 291, 301 n.16 (Me. 2000). A grandparent's desire to enjoy a relationship with a grandchild, no matter how intense, is not a "right" to have such a relationship. No one has a "right" to associate with other people's children, and the mere fact that a person is a blood relative of those children does not confer any such "right." As such, today's opinion wisely declines to identify protection of a nonexistent "right" as a justification for this statute.

these intra-family disputes, and assumes that judges can therefore best decide whether and on what terms children should visit with their grandparents.[2] The statute is not limited to cases where significant harm from the parent's decision has been demonstrated. It does not even require any showing of a preexisting relationship between the grandparent and the child. It does not require any showing of parental unfitness or even some parental shortcoming akin to or suggesting a risk of unfitness. As such, it is not narrowly tailored to serve any compelling State interest, and therefore does not withstand strict scrutiny.

b. *Redrafting the statute.* Recognizing that our grandparent visitation statute's reliance on the "best interest" of the child standard "cannot survive a due process challenge" in the wake of *Troxel, ante* at 657, the court today seeks to salvage its constitutionality by "interpreting" the term "best interest" to include the requirement that a fit parent's decision on visitation be given "presumptive validity" and allowing grandparents to overcome that presumption only if they establish, by a preponderance of the evidence, that the denial of visitation will "cause the child significant harm by adversely affecting the

---

[2]It also assumes that relationships with grandparents that are forced in this manner can confer a benefit on children. This is at best a dubious proposition. The warm, nurturing, and loving relationships we had with our grandparents were not the product of divisive intrafamily litigation and court orders that undermined our parents' authority. "[F]orced visitation in a family experiencing animosity between a child's parents and grandparents merely increases the potential for animosity and by its very nature cannot therefore be 'in the child's best interest.' " *Hawk* v. *Hawk*, 855 S.W.2d 573, 576 n.1 (Tenn. 1993). "[E]ven if such a bond [between child and grandparent] exists and would benefit the child if maintained, the impact of a lawsuit to enforce maintenance of the bond over the parents' objection can only have a deleterious effect on the child." *Brooks* v. *Parkerson*, 265 Ga. 189, 194, cert. denied, 516 U.S. 942 (1995). A grandparent visitation statute will often be "invoked by grandparents whose relationship with their own children has failed so badly that they must resort to lawsuits to visit the relationship problems with their children on the next generation. Where parent-grandparent lifestyle choices differ and relationships are strained, the law presents the prospect of competent parents being caught in a withering crossfire of lawsuits by as many as four sets of grandparents demanding involvement in the grandchildren's lives. . . . Each such resolution, successful for the grandparents, will usurp the parents' authority over the child and unavoidably insert the stress of litigation, dispute, and uncertainty into the grandchildren's lives." *Rideout* v. *Riendeau*, 761 A.2d 291, 309-310 (Me. 2000) (Alexander, J., dissenting).

child's health, safety, or welfare." *Ante* at 658. In short, whereas *Troxel* held that a visitation order predicated solely on a determination of the child's "best interest" cannot stand, today's opinion merely takes all of the principles of *Troxel* and reads them into the very "best interest" standard that *Troxel* found constitutionally inadequate. This is not "interpretation," or at least it is not a form of "interpretation" that comports with our judicial role. Rather, it is legislation masquerading as interpretation in order to salvage an admittedly unconstitutional statute.

"It is our duty to construe statutes so as to avoid such constitutional difficulties, *if reasonable principles of interpretation permit it*" (emphasis added). *School Comm. of Greenfield* v. *Greenfield Educ. Ass'n*, 385 Mass. 70, 79 (1982). Doubts as to a statute's constitutionality "should be avoided *if reasonable principles of interpretation permit doing so*" (emphasis added). *Staman* v. *Assessors of Chatham*, 351 Mass. 479, 487 (1966). "A statute, of course, must be construed, if possible, to avoid serious constitutional doubts. This principle, however, does not authorize the judiciary to supply qualifying words not fairly to be imported from the actual language of the statute." (Citations omitted.) *Mile Rd. Corp.* v. *Boston*, 345 Mass. 379, 383, appeal dismissed, 373 U.S. 541 (1963). When confronted with comparable constitutional infirmities in a statute, this court has declined to read into the defective statute the correct constitutional standard. For example, in *Commonwealth* v. *Horton*, 365 Mass. 164, 166, 167-168 (1974), this court refused to salvage the constitutionality of the obscenity statute (G. L. c. 272, § 28A), despite the fact that many other courts had rescued similar statutes by reading into them the "basic guidelines" prescribed by *Miller* v. *California*, 413 U.S. 15 (1973). Even though *Miller* itself specified that "authoritative judicial construction of an obscenity statute may fulfil the constitutional requirement that the State law specify that sexual conduct which is prohibited," *Commonwealth* v. *Horton, supra* at 167, this court declined to superimpose the *Miller* requirements onto the statute because "[t]o do so would require us to engage in a function which we, perhaps more than many courts, have been traditionally reluctant to perform." *Commonwealth* v. *Horton, supra* at 171. See *Pielech* v. *Massasoit Greyhound, Inc.*, 423 Mass. 534, 538-542

(1996), cert. denied, 520 U.S. 1131 (1997) (striking G. L. c. 151B, § 4 [1A], because it unconstitutionally favored adherents of established religions, rejecting plaintiffs' request that statute be interpreted as extending to persons of all religious beliefs so as to avoid constitutional defect); *Dalli* v. *Board of Educ.*, 358 Mass. 753, 758-759 (1971) (striking religious exemption from vaccination statute, rather than interpreting exemption to apply to all persons with sincerely held religious beliefs). "It would be an unacceptable statutory construction to find incorporated in the meaning of a statute, general in its terms, specific constitutional requirements not articulated until after enactment of the statute." *Commonwealth* v. *Upton*, 394 Mass. 363, 369 (1985) (rejecting defendant's argument that G. L. c. 276, § 2B, incorporated constitutional principles later articulated in *Aguilar* v. *Texas*, 378 U.S. 108 [1964]).

The "best interest" of the child standard set forth as the sole substantive provision of our visitation statute, enacted long before *Troxel*, is now "interpreted" to include each and every one of the requirements later imposed by *Troxel*. The irony, of course, is that *Troxel* itself found that visitation could *not* constitutionally be ordered based on a mere determination of the child's "best interest," but today's "interpretation" imbues the term "best interest" with all of the attributes necessary to correct each of the shortcomings that *Troxel* identified as inherent in that precise term. Then, in addition to reading all of the requirements of *Troxel* into the "best interest" of the child standard, the court also interprets it to contain the additional limitation that it refer only to "significant harm" to the child, as that limitation is also necessary to remedy the statute's obvious unconstitutionality. *Ante* at 658. The result is an overhaul of the statute that renders it constitutional, but this process cannot fairly be labeled "interpretation."

Other courts, post-*Troxel*, have been confronted with visitation statutes similarly predicated on nothing more than a determination of the child's "best interest" and have wisely resisted the temptation to salvage such statutes under the guise of "interpretation." See *Linder* v. *Linder*, 348 Ark. 322, 353-356 (2002) (where visitation statute's "best interest" standard did not identify any unfitness or harm that "would warrant state

intrusion," court declined "to completely rewrite" it because it "is best left to the [Legislature] to do [so], should it be so inclined"); *DeRose* v. *DeRose*, 249 Mich. App. 388, 395 (2002) (grandparent visitation statute premised solely on "best interests of the child" held unconstitutional per *Troxel*; court declined to "interpret" statute so as to avoid unconstitutionality, because "such an effort would require a significant, substantive rewriting of the statute" and "rewriting of the grandparent visitation statute is a task best left for the Legislature"). See also *Beagle* v. *Beagle*, 678 So. 2d 1271, 1272 (Fla. 1996) (visitation statute predicated on "child's best interest" unconstitutional on its face); *Brooks* v. *Parkerson*, 265 Ga. 189, 190, 194 (1995) (visitation predicated on proof that it was "necessary to the best interests of the child"; statute held unconstitutional on its face); *Wickham* v. *Byrne*, 199 Ill. 2d 309, 320-321 (2002) (same; "best interests and welfare of the child" standard); *Santi* v. *Santi*, 633 N.W.2d 312, 315, 321 (Iowa 2001) (same; "best interests of the child" standard).

Nor can this "interpretation" be justified as a natural extension of the use of the "best interest" standard that has "long been used in Massachusetts to decide issues of custody and visitation and other issues relating to child welfare." *Ante* at 657. The term "best interest" of the child has never been interpreted to mean anything remotely resembling the "interpretation" that is placed on it today.[3] In very differing contexts, the Legislature has prescribed what it intends by the term "best interest" of the child. For example, in G. L. c. 210, § 3 (*c*), the Legislature set forth what is to be considered in determining "the best interests of the child" when ruling on a petition for adoption in the absence of parental consent to that adoption. Where the Department of Social Services is caring for or providing services to children, the Legislature has adopted yet another definition of "best interests of the child." G. L. c. 119, § 1. For

---

[3] Recognizing the novelty of its "interpretation," the court remands this case with the suggestion that the parties be given "a reasonable opportunity to file additional materials," and expressly acknowledges that the Probate Court's standard form visitation complaints "will need to be revised to reflect the standards we have enunciated." *Ante* at 666 & n.26. The court apparently realizes that today's interpretation of "best interest" of the child represents a significant departure from our traditional articulation of that standard.

purposes of resolving custody disputes and support obligations between parents who are divorcing, the standard of "best interests of the child" is also used, but no definition has been provided. See G. L. c. 208, § 28 and § 31. See also *Yannas* v. *Frondistou-Yannas*, 395 Mass. 704, 710-712 (1985) (divorced parent may not remove child from Commonwealth without consent of other parent or court order "upon cause shown" under G. L. c. 208, § 30; court interpreted "upon cause shown" to require that removal be "in the best interests of the child").

These other contexts bear no resemblance to the situation presented by grandparents' claims for visitation under G. L. c. 119, § 39D, and, not surprisingly, the "interpretation" of "best interest" of the child created today is not linked to any of our prior jurisprudence interpreting that term. On petitions to dispense with parental consent to adoption, or in petitions for care and protection of children, there is a finding of unfitness or incapacity of the parent *prior* to any court decision about what is in the child's "best interest." See *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 589 (1981). In divorce proceedings, each parent is presumed to have an equal right to custody, G. L. c. 208, § 31, and the court is only called on to make determinations as to a child's "best interest" because the parties normally charged with making such decisions cannot themselves agree. See *Opinion of the Justices*, 427 Mass. 1201, 1204 (1998). Nowhere do we have any precedent or governing standards for determining a child's "best interest" where the child's parents are fit and competent and there is no dispute between them as to what is in the child's "best interest." Standards employed to make decisions when the persons who would normally make those decisions are unfit to do so, or are themselves in disagreement, provide no guidance for what it takes to *supplant* the unanimous decision of perfectly competent parents. Thus, in crafting an interpretation of the "best interest" of the child under our grandparent visitation statute, the court is simply making it up, or, more precisely, is engrafting onto that sole, general term each and every requirement, presumption, and limitation necessary to correct the statute's obvious constitutional infirmities.

The court today adds other provisions and requirements that

are nowhere set forth in the statute. In recognition of the fact that "the burden of litigating a domestic relations proceeding can itself be 'so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated,'" *ante* at 666, quoting *Troxel, supra* at 75, quoting *id.* at 101 (Kennedy, J., dissenting), the court invents and inserts a pleading requirement that is contrary to our normal notice pleading. The court now requires that grandparents submit a "detailed and verified" complaint for visitation, or an affidavit accompanying their complaint, and provides that the absence or inadequacy of that verified complaint or affidavit will render the complaint subject to dismissal on the parents' motion. *Ante* at 666. The court then confidently concludes that this requirement "should minimize the burden" of defending against "unwarranted" claims for visitation. *Id.*

This is not only legislation — the court does not even pretend that this is "interpretation" — but it is ineffective legislation at that. The affidavit requirement imposed by today's decision will do little (if anything) to relieve parents of the burdens of this kind of litigation. Parents will still have to hire a lawyer in order to pursue a motion to dismiss; and, as long as the grandparent can file a complaint or affidavit that alleges any disruption of a prior relationship with the child (and therefore a basis for claiming that the child will be "harmed" by the severance of that relationship), the motion to dismiss will not succeed in promptly terminating what has proved to be a protracted form of litigation. See, e.g., *Linder* v. *Linder*, 348 Ark. 322, 356 (2002) (visitation litigation lasted four years); *Steward* v. *Steward*, 111 Nev. 295, 297-300 (1995) (three years elapsed between filing of petition and order for visitation, followed by another year of appellate proceedings to get visitation order overturned); Nolan, Beyond Troxel: The Pragmatic Challenges of Grandparent Visitation Continue, 50 Drake L. Rev. 267 (2002). Fit, competent parents will still be haled into court, and required to pay legal fees, to explain to a judge their reasons for deciding not to let their child visit with a particular grandparent on particular terms. In order to defeat the request for visitation, they may have to "expose what can only be described as the

family's 'dirty linen.' " *Hawk* v. *Hawk*, 855 S.W.2d 573, 577 n.2 (Tenn. 1993). See *Steward* v. *Steward*, *supra* at 297-298 (divorced parents' opposition to petition related grandmother's history of gambling, suicide threats, threats to kill family members, false accusations of adultery, and interference with their marriage). The court's tinkering with our notice pleading requirements does not serve to lessen the inordinate burdens of such divisive intrafamily litigation. When the Legislature intends to create a procedure for the prompt dismissal of disfavored litigation, it knows how to do so. See G. L. c. 231, § 59H (special motion to dismiss "SLAPP" suits). We should leave it to the Legislature to craft special methods for disposing of, or deterring, inappropriate visitation complaints. That is the Legislature's job, not ours, and the court's attempt at its own legislation will prove woefully inadequate to the task of reducing the crippling burdens of grandparent visitation litigation.

In many States, grandparent visitation statutes expressly list factors that the court is to consider before ordering visitation.[4] Many visitation statutes contain an express requirement that the party seeking visitation demonstrate the existence of a prior relationship with the child.[5] As noted in today's opinion, all fifty States have adopted some form of grandparent visitation statute, and those statutes "vary considerably." *Ante* at 655 n.9. There is a vast array of options amongst the differing provisions, both substantive and procedural, that States have enacted. It is not up to this court to pick and choose from among that vast array simply to rescue this statute. Such choices are the essence of legislation, not judicial interpretation.

This visitation statute was enacted well before *Troxel.* *Troxel* now tells us that a statute providing for court-ordered visitation

---

[4]See, e.g., Ala. Code § 30-3-4.1 (d) (LexisNexis Supp. 2001); Ariz. Rev. Stat. Ann. § 25-409 (C) (West 2000); Fla. Stat. Ann. § 752.01 (2) (West Supp. 2002); Me. Rev. Stat. Ann. tit. 19-A, § 1803 (3) (West 1998); Nev. Rev. Stat. § 125C.050 (6) (2001); N.J. Stat. Ann. § 9:2-7.1 (b) (West Supp. 2002); Tenn. Code Ann. § 36-6-307 (LexisNexis 2001); Vt. Stat. Ann. tit. 15, § 1013 (b) (1989); W. Va. Code § 48-10-502 (Lexis 2001).

[5]See, e.g., Cal. Fam. Code § 3104(a)(1) (West 1994); Iowa Code Ann. § 598.35 (West 2001); Kan. Stat. Ann. § 38-129(a) (2000); Miss. Code Ann. § 93-16-3(2) (1994); Neb. Rev. Stat. Ann. § 43-1802(2) (Lexis 1999); N.C. Gen. Stat. § 50-13.2A (Lexis 1999); Or. Rev. Stat. § 109.119 (2001); Tenn. Code Ann. § 36-6-306 (LexisNexis 2001).

with children can be constitutional, but makes clear that a statute predicated solely on a "best interest" standard will not pass muster. We should therefore tell the Legislature that, in light of *Troxel*, a statute allowing judges to override parents' decisions concerning visitation with grandparents cannot be premised merely on a judicial determination of the child's "best interest." If it wishes to, the Legislature may then enact those precise requirements, definitions, standards, and procedural protections that it intends, consistent with constitutional requirements. There is more than one way to devise a visitation statute that would survive strict scrutiny, and it is up to the Legislature, not this court, to decide which of those many possible approaches it wishes to take. I would therefore simply rule, as the Probate Court judge did below, that this statute is unconstitutional on its face.

3. *Equal protection.* The grandparent visitation statute also suffers glaring equal protection defects. It makes some parents and children subject to complaints for grandparent visitation, but exempts others, predicated entirely on the parents' living arrangements. Because the statute implicates a fundamental liberty interest, the statute's classifications must also be subjected to strict scrutiny. See *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988); *English* v. *New England Med. Ctr., Inc.*, 405 Mass. 423, 428-429 (1989), cert. denied, 493 U.S. 1056 (1990). Thus, the statute's constitutionality is dependent upon "a showing that the difference in treatment is necessary to the promotion of a compelling State interest." *Paro* v. *Longwood Hosp.*, 373 Mass. 645, 649 (1977). The classifications drawn by the grandparent visitation statute do not survive that level of scrutiny.

A visitation order may be sought whenever the child's parents are "divorced, married but living apart, under a temporary order or judgment of separate support, or if either or both parents are deceased," or, if the child was born out of wedlock, whenever "the parents do not reside together."[6] G. L. c. 119, § 39D. Thus, if both of the child's parents do not reside in the same household with the child, grandparents may bring an action for

---

[6] Paternal grandparents of children born out of wedlock may only seek visitation if paternity has been adjudicated or acknowledged. G. L. c. 119, § 39D.

visitation. However, whenever the child's parents are residing together, there can be no action for grandparent visitation. Although ostensibly described as separate categories, the classes of parents subject to this statute all share the singular defining characteristic that they do not reside with the child's other parent, whereas all parents who reside together are completely exempt from visitation claims by grandparents.[7]

This distinction between parents whose fundamental rights are to be infringed cannot withstand strict scrutiny. Where the compelling State interest at stake is the prevention of significant harm to children, the classifications must be narrowly tailored to serve that interest, i.e., to identify children who are more likely to be harmed by, or who will suffer greater harm from, the denial of visitation with grandparents. There may be some defining characteristics that would operate, in a narrowly tailored way, to identify such children, but the mere fact that the child's biological parents do not live in the same household does not identify a category of at-risk children with anything approaching the requisite degree of precision. The mother correctly contends that the classifications in the statute are both overinclusive, in that they sweep into the statute large numbers of children at no greater risk of harm from the denial of visitation, and underinclusive, in that they exclude many common domestic situations that do expose children to an increased risk of harm from the denial of visitation.

Invoking principles governing representative standing (*ante* at 661, quoting *Slama* v. *Attorney Gen.*, 384 Mass. 620, 624 [1981]), and the requirement that only someone injured by a statute may challenge its constitutionality (*ante* at 661, quoting *Massachusetts Comm'n Against Discrimination* v. *Colangelo*, 344 Mass. 387, 390 [1962]), the court concludes that it can essentially ignore the mother's equal protection arguments, and

[7]The description of separate categories, despite their unifying characteristic of parental living arrangements, is the product of the gradual expansion of the reach of the statute, with each successive amendment adding a new category of parents made subject to visitation complaints. See St. 1972, c. 631 (authorizing parent of deceased parent to petition for visitation with grandchild); St. 1982, c. 514 (extending statute to divorced parents); St. 1991, c. 292 (extending statute to married parents living apart and to unmarried parents living apart).

addresses only the claim of overinclusiveness at issue in the precise category into which these parents are assigned (i.e., never married and not living together). There is no question that these parents are presently being injured by the visitation statute — they have been summoned into court, required to explain their reasons for denying visitation,[8] and will continue to incur ongoing expense and uncertainty pending the final outcome of a very painful form of litigation. The only reason that they are required to suffer that injury is that they are not presently living together. The grandfather's petition here could be defeated, rendered subject to immediate dismissal, if the father of this child moved in with the mother tomorrow. It is the parents' decision to live apart, not any other characteristic pertaining to them, to their son, or to the petitioning grandfather, that gives this grandfather standing to seek visitation. Surely the parents have standing to challenge whether that single characteristic, that defines all the parents who are subject to the statute's reach, violates their right to equal protection.

Under the court's approach, however, no one could ever bring an equal protection challenge based on the underinclusiveness of a statute burdening fundamental rights, even though underinclusiveness would be one way in which a statute may fail to be narrowly tailored. Persons who have escaped the burdens of such a statute are not going to bring suit asking that those burdens be placed on them, and, according to the court today, those who have been unfairly singled out for such infringement of their rights may not complain that the statute unfairly fails to reach others who are at least as deserving of the statute's burdens. And, under the court's approach, claims of overinclusiveness will be looked at in the isolation of the plaintiff's own category under a statute, ignoring the actual "tailoring" of the statute as a whole and pretending that the statute was addressed at only that single category. Statutes that would fail the test of "narrowly tailored to serve a compelling State interest" will ap-

---

[8]As predicted in *Hawk* v. *Hawk*, 855 S.W.2d 573, 577 n.2 (Tenn. 1993), defense of the case has forced the parents to "expose . . . the family's 'dirty linen.' " The genesis of the parents' decision to discontinue visitation between their son and his maternal grandfather was the grandfather's own acrimonious divorce from the child's grandmother, a dispute in which the child's mother has sided with the grandmother.

parently be upheld as long as there is anyone who *could* lawfully be burdened by a more narrowly tailored statute. By definition, a statute that is either overinclusive or underinclusive still has some legitimate sweep and could lawfully be applied to at least some persons. Telling litigants that statutes burdening fundamental rights, no matter how lacking in narrow tailoring, will be upheld on a facial challenge whenever the burdens they impose could lawfully be imposed on at least someone is an approach that dooms facial challenges on equal protection grounds to failure. Rather than endorse the court's cramped view of equal protection guarantees, leaving a multitude of parent defendants only the costly recourse of repeated "as-applied" challenges to a statute that, by its terms, poses significant equal protection problems, I would consider whether this statute, as a whole, qualifies as narrowly tailored to serve the identified compelling State interest that it ostensibly serves.[9] For the following reasons, the statute fails that test.

The first category created by the statute is parents who are divorced.[10] The statute pays no heed to the circumstance that both divorced parents may in fact agree that visitation with a particular grandparent is inappropriate. It also ignores living arrangements whereby a divorced parent with custody lives with or marries another adult, and thus raises the child in a household that fully resembles a two-parent household. Indeed, the child's household may consist of one actual parent and one de facto parent. Even if the child's stepparent in such a household adopts the child, such that the child is residing with both lawful "parents," the statute still applies.[11] Thus, notwithstanding the stability of the household and child-rearing arrangements of many divorced parents, and notwithstanding their unanimous agreement on the issue of grandparent visitation, the mere fact

---

[9]At our request, the parties and various amici submitted additional briefing on the full panoply of equal protection issues in the visitation statute. The decision to ignore most of the briefing we specifically requested is puzzling.

[10]Similarly, the statute covers parents who are living apart under an order or judgment of separate support, an arrangement that is a common prelude to divorce.

[11]Grandparent visitation petitions are cut off by adoption only where the child "has been adopted by a person *other than a stepparent of such child*" (emphasis added). G. L. c. 119, § 39D.

of their prior divorce is what makes their parental decisions perpetually subject to judicial review. See *Belair* v. *Drew*, 776 So. 2d 1105, 1106 (Fla. Dist. Ct. App. 2001) (grandparent visitation statute governing divorced parents unconstitutional on its face; "a divorced natural parent should have no lesser privacy rights than a married or widowed natural parent"). See also *Lulay* v. *Lulay*, 193 Ill. 2d 455, 478-479 (2000) (State does not have compelling interest sufficient to justify visitation order merely because grandchildren's lives "have been disrupted because of their parents' divorce").

Next, the statute applies to married parents who are, for whatever reason, not living together. Why that circumstance should affect their parental rights is incomprehensible. A parent may be temporarily absent from the home for any one of a number of reasons having nothing to do with unfitness or lack of family stability. The absent parent may be living elsewhere to pursue further education, or because of a job transfer, or to perform military service. A parent who is accepted at an institution of higher learning that is at some distance from the family home may well decide not to uproot the whole family for what is expected to be a temporary period. A parent whose job is transferred to a different part of the country may postpone the relocation of the rest of the family so that the children can complete their present grade at school. Or, as recent events illustrate, one parent can suddenly be summoned to active military duty in a foreign country. That married parents sometimes live apart is no indicator of family disharmony, instability, or parental shortcoming. I can identify no State interest whatsoever, let alone a compelling one, that is served by subjecting married parents to visitation complaints merely because they are presently living apart, while exempting all other married parents from the same burden on their fundamental parental rights.

The next classification imposed by the statute pertains to the death of a child's parent. This is hardly a sign of unfitness or a "red flag" warranting judicial intervention. On what basis does the State assume that a surviving parent needs to have his or her decisions reviewed by a judge? And, as with divorced parents, the surviving parent's living with another partner, or

remarriage, or even the stepparent's adoption of the child, leaves the surviving parent permanently subject to the statute, notwithstanding the fact that that surviving parent has recreated a classic, nuclear family in which to raise the child. See *Von Eiff* v. *Azicri*, 720 So. 2d 510, 515-516 (Fla. 1998) ("We find nothing in the unfortunate circumstance of one biological parent's death that would affect the surviving parent's right of privacy in a parenting decision concerning the child's contact with her maternal grandparents," noting that surviving father had remarried and new wife had adopted child); *Wickham* v. *Byrne*, 199 Ill. 2d 309, 317 (2002) (where grandparent argued that visitation statute allowed judge to "step[] into the shoes of the deceased parent to protect and maintain the children's family heritage," court "reject[ed] any argument that single parents are entitled to less constitutional liberty in decisions concerning the care, custody, and control of their children"); *Neal* v. *Lee*, 14 P.3d 547, 550 (Okla. 2000) ("[child's] father's death does not affect [mother's] fitness as a mother nor alter her constitutionally protected rights to rear her child without state interference").

The next category is parents of children born out of wedlock where the parents are not living together. Again, this category fails to acknowledge that such parents may, despite their separate living arrangements, be raising the child in a perfectly stable manner. Indeed, unwed parents may temporarily live apart for all of the same reasons that married parents sometimes live apart, e.g., to complete one parent's education, to comply with a job transfer, or to perform military service. And, as with divorced parents, the category of unwed parents not presently living together also fails to recognize that the custodial parent may be living with (or married to) someone who has become the child's de facto parent or who has even adopted the child. Notwithstanding prevalent stereotypes of unwed mothers, many children who were born out of wedlock ultimately live in perfectly stable homes. Premising judicial involvement on the mere fact that the custodial parent of such a child does not presently live with the child's other biological parent is utterly unwarranted. See *Saul* v. *Brunetti*, 753 So. 2d 26, 28 (Fla. 2000) (fact that child's parents "were never married should not change

this Court's analysis of the constitutionality of this [visitation] statute'').

Essentially all parents raising children in nontraditional families are pulled into this statutory scheme. Many gay and lesbian couples raising children will be subject to this form of judicial interference, as the gay or lesbian parent of the child is no longer residing with the child's other biological parent. Divorced, single, or widowed parents who move in with other family members, and raise their children in an extended family, are subject to complaints under the statute, as are all parents who later live with or even marry someone other than a biological parent of the child. And, by definition, any parent who is raising his or her child single-handedly is subject to such proceedings. Rather than recognize the wealth of diversity in today's American family, this statute casts a slur on the parenting abilities of anyone whose family living arrangements deviate from the traditional, nuclear family consisting of father, mother, and their biological children.[12]

Looking solely at the category of parents who were never married to each other and who are not presently living together, the court resorts to vague generalizations verging on pure stereotypes of families that are not "intact" to justify subjecting such parents, but not others, to the intrusive burdens of the visitation statute. *Ante* at 663-664. The court posits that children of unwed parents living apart "may be at heightened risk," that they "may be especially vulnerable," and that for "households in which children are raised by single parents, grandparents may play an increasingly important role." *Ante* at 663. In con-

---

[12]The suggestion that we might circumvent this problem by resorting to a novel definition of "parents" (*ante* 662 at n.22) defies the clear import of the statute. Given that not even a stepparent adoption suffices to make the biological parent and the adoptive parent the child's "parents" for purposes of G. L. c. 119, § 39D, and given the statute's requirement of an adjudication of "paternity" for a child born out of wedlock, it is apparent that grandparent visitation rights are predicated on the living arrangements of the child's biological parents. The statute leaves no room for creative definitions of the term "parent" that would exempt stable but untraditional families from this scheme. Thus, with specific applicability to gay and lesbian couples, if they are raising a child that is the biological child of one partner, the fact that the other partner has become a de facto parent, or even an adoptive parent, will not serve to exempt them from the operation of the statute.

clusory fashion, the court states that these distinctions are "drawn from social experience." *Ante* at 663.

The first mistaken assumption in the court's analysis is the assumption that the category of parents who were never married and are now living apart describes a category of "households in which children are raised by single parents." *Ante* at 663. It does not. The custodial parent can be living with or married to another adult, and that other adult may well have become a de facto parent or even the child's legal parent by way of adoption, yet the statute still applies. These are not single-parent homes, nor are they homes that place a child at greater risk of harm from denial of grandparents' visitation. Are we to assume that children living with gay or lesbian couples are "especially vulnerable to real harm," *ante* at 663, merely because they are not living with both of their biological parents? Are we to assume that a child adopted by a stepparent is similarly afflicted with some special vulnerability because only one of the parents in the household is a natural biological parent? Assuming (without deciding) that children being raised by only a single adult comprise a category of children at greater risk because they will not "be able to draw on the resources of two parents," *ante* at 664, the category of unwed parents as defined by the statute is hopelessly overinclusive. The mere fact that one parent does not presently live with the child's other biological parent is simply not a narrowly tailored method of identifying those parents who are raising children single-handedly. As such, any justification for the categories identified by the visitation statute cannot be premised on any assumptions about the particular needs of children living in single-parent households. If that is the category intended, it is a mere subcategory of the classification described in the statute, and that subcategory could, with ease, be defined with narrowly tailored precision.

Nor can this classification be justified on the theory that children of unwed parents living apart will have already suffered some traumatizing disruption of their family structure or family relationships, such that they have a greater need for their grandparents. There is no "disruption" of the child's family at all if the parents never lived together, or did so only at a time when the child was too young to remember the presence of the

other parent in the household.[13] Nor can one assume that there is discord or disharmony stemming from the fact that the parents do not live together. Indeed, in this case, both parents are closely involved in the child's upbringing and have agreed all along that visitation with this grandfather is inappropriate for the child. Disruption in a child's life is not inherent in today's diverse family structures, particularly where those family structures have been deliberately established from the child's earliest years as the norm in which the child is being raised. Indeed, the event that would disrupt such a child's life would be the sudden addition to the household of a parent the child never lived with or knew, yet that is the precise event that would *terminate* the application of the visitation statute.

Even where a parent's departure has inflicted a sense of "loss, inadequacy, and insecurity" on a child, *ante* at 664, one cannot assume that the effects of that disruption persist throughout the child's minority. The statute contains no time limitation on filing visitation complaints. Thus, for example, a child whose parent left the household when the child was only three years old may well suffer significant emotional trauma at the time, but that trauma is not alleviated in any way by a forced order of grandparent visitation when the child is a teenager. A narrowly tailored statute could perhaps allow for visitation complaints in the relatively recent aftermath of a genuine disruption in the child's household, as that would perhaps define a category of children with greater need for continuity in other family relationships, but a statute that contains no time limit, no temporal relation between the disruption and the visitation complaint, has not narrowly defined a category of children with such needs.

The court does correctly point out that parents who are trying to raise a child single-handedly more often make a "deliberate choice" to foster a "bond" between the child and a grandparent, such that State intervention "may be necessary to secure the child's well-being from traumatic separation from the grandparent." *Ante* at 664. Again, however, the classification at issue not only fails as a narrowly tailored definition of single-parent households where such reliance on a grandparent may

---

[13]In the present case, the father moved out of the household when the child was eighteen months old.

have developed, but the statute does not even require as a predicate that there be *any* prior relationship with the grandparent, let alone one that has become "crucial to the child's physical or emotional security." *Ante* at 664. A parent may, from the child's birth, have prohibited any contact with the grandparent, yet the completely estranged grandparent may, based solely on the parents' living arrangements, bring a claim for visitation.[14] If the objective is to reach a category of children who have developed a "crucial" relationship with a grandparent, a category of children of unwed parents living apart is not a narrowly tailored definition of children who have such relationships, and the statute could easily articulate the category that is now proffered as the justification for the overbroad category into which these parents fall.

What is also puzzling about this justification is its somewhat circular logic. If single parents have voluntarily fostered a bond between child and grandparent, why would they then be more likely than other parents to harm the child by severing that bond? To the contrary, single parents have a greater, not a lesser, incentive to maintain the relationships on which they have deliberately led the child to rely. If a parent is raising a child single-handedly without any other adult in the household, the many pragmatic burdens of caring for a child in such circumstances would, if anything, drive a parent to closer reliance on other family members, including grandparents, to help ease those burdens. These are the very parents who are the least apt, and the least able, to turn away offers of assistance in caring for the child, who have the greatest incentive to keep the child's grandparents closely involved with the child, and who are therefore the least likely to reject such assistance for arbitrary or unsound reasons. Put bluntly, grandparents provide "free babysitting," a precious commodity to any single parent, and a commodity they are unlikely to refuse absent some compelling reason. It is not surprising that in such households, as a purely voluntary matter, "grandparents may play an increasingly

---

[14]The court's "interpretation" of the "best interest" standard does not require that the grandparent prove the existence of a prior relationship with the child. *Ante* at 657-658. Thus, the predicate for the classification that is now proffered appears in neither the statute's standing provisions nor in the court's "interpretation" of its substantive provisions.

important role in child rearing," *ante* at 663, citing *Troxel, supra* at 63-64, but there is nothing to indicate that, having done so, single parents are more likely to make an irrational about-face and banish the grandparent who has provided that assistance to date.

Finally, the court's justification for this distinction relies on a great deal of what "may" be the case — grandparents "may" play an important role for such children, such children "may be especially vulnerable" or "may be at heightened risk." *Ante* at 663. The rational basis test can resort to mere possibilities as justification for classifications, and I accept the premise that the classifications in this statute, as overbroad as they are, could withstand review under a rational basis analysis. Loose approximations, based on marginally rational assumptions, suffice for that highly deferential test. See *Marshfield Family Skateland, Inc.* v. *Marshfield*, 389 Mass. 436, 446, appeal dismissed, 464 U.S. 987 (1983), quoting *Commonwealth* v. *Henry's Drywall Co.*, 366 Mass. 539, 541 (1974) (classification survives rational basis test "if any state of facts reasonably may be conceived to justify it"). However, the requirement that a statute be narrowly tailored to serve a compelling State interest requires more than a mere possibility, more than just rough approximations and tenuous assumptions, to justify burdening some parents' fundamental rights while exempting other parents from those burdens. The distinctions drawn must be "necessary" to promote the identified compelling interest, not just rationally related to it. *Paro* v. *Longwood Hosp.*, 373 Mass. 645, 649 (1977). Here, the approximations, possibilities, and assumptions invoked by the court do not suffice for purposes of the strict scrutiny to which this statute must be subjected.

Ultimately, the court justifies turning a blind eye to the overbreadth of the statute on the theory that, because the court has required a showing of harm, "the State will not intrude into a nonintact family in the absence of a showing of significant harm." *Ante* at 665. The "significant harm" requirement is necessary to cure the statute's substantive due process defects, as the State may not impinge on anyone's fundamental rights other than to promote a compelling State interest. Having satisfied substantive due process, however, there remains the

independent equal protection requirement that, if a statute affecting fundamental rights applies only to some persons, the classification of persons subject to the statute must also be narrowly tailored to serve that compelling State interest. This requirement is particularly important where, as here, the burdens of such litigation are substantial, even for those parents who ultimately prevail. The substantive provisions necessary to comport with due process do not make equal protection superfluous.[15] The classifications, not just the substantive provisions, must themselves be narrowly tailored to serve a compelling State interest.

If the visitation statute impermissibly extended to only a small group of rare cases outside its legitimate sweep, I would endorse the court's preference for letting those rare cases be resolved by "as-applied" challenges, rather than by declaring the statute's classifications unconstitutional on their face. The overinclusiveness here, however, is substantial, extending the statute to all parents who, for whatever reason, do not presently live together.[16] I see no reason why such parents, or why the Probate and Family Court, should have to address this extreme overbreadth only by way of a barrage of individual challenges to the statute as applied.

Moreover, "as-applied" challenges do nothing to remedy the statute's underinclusiveness, a defect that today's opinion declines to address. There are surely many children living with both of their parents who have an equally compelling need for continuity in their relationships with grandparents. Living with both biological parents does not serve to insulate a child from trauma, loss, or genuine disruption. Children living in households where one biological parent subjects the other

---

[15]For example, a visitation statute that applied only to gay and lesbian parents could not pass equal protection strict scrutiny merely by providing that visitation could only be ordered to prevent significant harm to the child.

[16]The "plethora of hypothetical situations" articulated here are not listed for purposes of "invalidat[ing] the statute on any ground," *ante* at 665, but are provided as mere illustration of the fact that the overbreadth here is indeed substantial. It does not require much in the way of creativity to identify many, common parenting arrangements that will, despite the fact that they pose no increased risk of harm to the child, make parents subject to this statute, and the very ease with which one can posit numerous such hypotheticals is what demonstrates the glaring overbreadth of these classifications.

biological parent to domestic violence surely have greater need for healthy relationships with their grandparents than do children who have been adopted by a stepparent into a stable home. One parent (or even both parents) in a two-parent household may suffer from a host of conditions — substance abuse, major mental illness, serious disease, or severe disability — that drain attention and resources away from a child, making the child utterly reliant on a grandparent. The same would be true of children who are themselves suffering other forms of loss or trauma — e.g., the death or catastrophic injury of a sibling, the child's own severe disability from accident or illness, the death of another grandparent, or a move to new home that uproots the child from all of his or her previously familiar surroundings. Grandparents are a bulwark for many families, including the two-parent households exempted from this visitation statute, and in all such households, a grandparent may provide the crucial presence of a stable, loving adult on whom the child can depend. Continuity in relationships is important to all children, whether or not they live with both of their biological parents. If these classifications are intended to identify children in need of continuity in relationships, the classifications are hopelessly underinclusive as well as overinclusive. They have not been narrowly drawn to identify children with such needs.

Instead, these classifications were drawn for the express purpose of protecting "grandparents' rights." The obvious concern underlying each of these classifications is that the parents of the absent or deceased parent no longer have anyone in the child's household with whom they have a blood relationship and, lacking such a relationship, they understandably fear that the remaining parent will be less accommodating of their desire to see the grandchildren. From the grandparents' point of view, this is unquestionably a heart-wrenching situation, and their worries are well founded. It is readily apparent that the desire to "balance the scales" for such dispossessed grandparents is the true basis for the statute's classifications. Indeed, throughout the statute's history, the various enactments that comprise G. L. c. 119, § 39D, have been referred to as promoting "grandparents' visitation rights," not as promoting the welfare of children, with each successive enactment identifying

yet another category of grandparents who might be "frozen out" of their grandchildren's lives because of the departure or death of one parent. See St. 1972, c. 631 (act "to grant visitation rights to certain grandparents," authorizing the parent of a deceased parent to petition for visitation with grandchild); St. 1982, c. 514 (an act "to grant visitation rights to grandparents," permitting visitation petition if parents are divorced)[17]; St. 1991, c. 292 (act "relative to the rights of grandparents," permitting visitation petition if parents are married but living apart or if child born out of wedlock and parents living apart).[18] If the protection of such "grandparents' rights" were a compelling State interest, these classifications would easily pass strict scrutiny, as they provide a remedy for those grandparents who are most likely to face obstacles in asserting those "rights." However, grandparents do not have any such "rights," either at common law or under the Federal or State Constitution. See note 1, *supra.* Grandparents have strong feelings and sometimes deep attachments to their grandchildren, but they do not have a "right" to visit with their grandchildren.

As such, we are now dealing with legislation that was designed, and its categories created, for the purpose of serving a nonexistent "right" that does not qualify as a compelling State interest. I recognize that, if the resulting legislation had fortuitously turned out to be narrowly tailored to serve the legitimate and compelling State interest in protecting children from significant harm, the actual motives of the legislators who supported the legislation would be irrelevant. See *Prudential Ins. Co.* v. *Commissioner of Revenue*, 429 Mass. 560, 568 (1999), citing *FCC* v. *Beach Communications, Inc.*, 508 U.S. 307, 315 (1993). However, when purposes far removed from the subsequently identified compelling State interest are what

---

[17]The bill's sponsor proclaimed that the statute would "clarify a very fundamental and basic right of grandparents," and explained that the amendment was prompted by the "fear" that "grandparents are left out in the cold" after the parents' divorce. State House News Service (House Sess.), May 19, 1982, at 29-30.

[18]In a letter to the Governor, one of the bill's sponsors described that the purpose of the 1992 amendment was "to give grandparents equal visitation rights to grandchildren who were born out of wedlock," and noted that the bill was supported by "various grandparent organizations."

the statute was actually designed to serve, we should not be surprised to discover that the statute is not narrowly tailored to serve the compelling State interest that is proffered as the post hoc justification for the statute's classifications. Here, the categories of grandparents whose "rights" are to be protected serve to identify those grandparents who are the least able to exert influence over the grandchild's remaining natural, custodial parent. Those same categories do not serve to identify children with a greater need for grandparent visitation. Trying to justify a statute designed to further the interests of grandparents on the theory that it narrowly defines a category of grandchildren in need is the equivalent of saying that a square peg is narrowly tailored to fit a round hole.

I would hold that the statute's equal protection infirmities must also be addressed by the Legislature, and that they cannot be cured by resort to vague generalizations about families that are not "intact." *Ante* at 663. Classifications that identify children at greater risk can surely be drawn with greater precision than the classifications in this statute. As the statute stands, however, the one characteristic that results in parents being subject to this infringement on family autonomy is not a characteristic that is a narrowly tailored predictor of children at risk.

4. *Conclusion.* Given the substantive due process defects in the statute's "best interest" of the child standard, along with the lack of narrow tailoring in the classifications of parents and children who will be subjected to this form of State interference, I would affirm the decision below and declare the statute unconstitutional on its face. There can be compelling State interests sufficient to warrant court-ordered visitation with grandparents, but the substantive provisions and classifications in this statute are not narrowly tailored to serve any such interests. I would leave it to the Legislature to articulate the interests that would justify such legislation, to redefine the standards necessary to serve those interests, and to identify appropriate classes of parents, children, and grandparents who need to be subjected to such proceedings in order to serve those interests.

By definition, grandparents themselves were parents, and, as long as they were fit parents, they were given unfettered discre-

tion to raise their children free from State interference. No matter how well intentioned, they cannot now deny their own children that same right to raise the next generation, also free from State interference. Finding this statute unconstitutional does not, in any way, diminish the importance of grandparents in the lives of our families and in the fabric of our society. It merely states, as it must, that State interference in parental decision-making can only occur "under serious provocation," *Custody of a Minor (No. 3)*, 378 Mass. 732, 749 (1979), and only using classifications that are narrowly tailored to remedy that "serious provocation." This statute does not meet these exacting requirements of strict scrutiny. Our reverence for our grandparents, our hope to see our own grandchildren, and our wish that all children may enjoy healthy relationships with their grandparents, do not allow us to relax those constitutional standards. We must not "substitute[] sentimentality for constitutionality" or "exalt[] the socially desirable goal of grandparent-grandchild bonding over the constitutionally recognized right of parents to decide with whom their children will associate." *Santi* v. *Santi*, 633 N.W.2d 312, 320 (Iowa 2001). I, therefore, respectfully dissent.