# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Laverne Bazen and Pansy Bazen, Respondents,

v.

Tammie Bazen, Appellant.

Appellate Case No. 2018-000337

―――――――――

Appeal from Horry County
Ronald R. Norton, Family Court Judge

―――――――――

Opinion No. 27925
Heard June 12, 2019 – Filed October 30, 2019

―――――――――

## AFFIRMED AS MODIFIED

―――――――――

Whitney Boykin Harrison, McGowan Hood & Felder, LLC, of Columbia; Carolyn R. Hills and Jennifer Darrow Hills, Hills & Hills, PC, of Myrtle Beach, for Appellant.

Stuart Wesley Snow, Dusenbury, Snow & Evans, PA, of Florence; Charles Edward Parrish, Charles Edward Parrish, PA, of Conway, for Respondents.

―――――――――

**JUSTICE FEW:** This is a challenge to the family court's order permitting grandparent visitation under subsection 63-3-530(A)(33) of the South Carolina Code (Supp. 2019). We reject the mother's argument the subsection is unconstitutional. We find the grandparents satisfied the requirements of the subsection and are entitled

to have some visitation. Thus, we affirm. However, we find it necessary to accommodate reasonable restrictions the mother sought to impose on visitation. In light of this finding, we modify the visitation schedule.

## I.    Facts and Procedural History

Stacey and Tammie Bazen married in 1999 and lived in Myrtle Beach. The marriage was unstable, with frequent separations and accusations that Stacey was unfaithful. Their first daughter was born in 2004. They later had a son, but he never left neonatal intensive care and died before he was two months old. In 2008, they had twin girls. At the time of Stacey's death in 2013, he and Tammie were again separated. Stacey was living at the home of his parents—Laverne and Pansy Bazen—in Pamplico, South Carolina. Pamplico is located in eastern Florence County, approximately fifty miles from where the children live with Tammie in Myrtle Beach.

The grandparents saw the children frequently until Stacey died, mostly in Myrtle Beach. During the periods of Stacey and Tammie's separation, including at the time of Stacey's death, the children would visit with Stacey at the grandparents' home. The grandparents developed a positive, loving relationship with the children. The children were 9 and 5 at the time of Stacey's death.

As the family court found, Tammie and the grandparents "had a great amount of animosity between them." Tammie's relationship with the grandparents soured when the twins were very young. After she was told Stacey was having an affair, she discussed the situation with Stacey's father, Laverne. Tammie felt Laverne did not support her. When Tammie and Stacey eventually reconciled, she felt her relationship with his parents was different. She testified, "I didn't feel welcomed anymore. I didn't feel any kindness. It was really kind of like hands-off; kind of -- in a way, fake to me; like they were going through the motions. There was no true kindness." She testified the grandparents resented her for reporting Stacey to the police for assaulting her, and Laverne told her she "never loved" his son.

Soon after Stacey died, Tammie had a dispute with the grandparents over Stacey's estate. The dispute carried over into their communication about the grandparents seeing the children. At one point not long after Stacey's funeral, Tammie told the children—in the presence of the grandparents—"Y'all won't see Pawpaw [Laverne] any more." After that day, the grandparents saw the children only occasionally until early 2015 when their great grandmother passed away. After that, the grandparents

did not see the children again until Thanksgiving 2015, when they went to Tammie's home unannounced. After a short visit that day, Tammie told them not to show up unannounced and said "you need to call before you come." The family court summed up the relationship between Tammie and the grandparents during trial, stating, "It's so painfully obvious to the court that these people do not get along."

The grandparents filed suit in family court in July 2016 seeking an order pursuant to subsection 63-3-530(A)(33) requiring Tammie to allow visitation. The case went to trial in October 2017. The family court entered an order on November 17, 2017, granting visitation. Tammie appeals the November 2017 order. Because Tammie challenges the constitutionality of subsection 63-3-530(A)(33), the court of appeals transferred the appeal to this Court pursuant to Rule 203(d)(1)(A)(ii) of the South Carolina Appellate Court Rules, which requires appeals to be filed in the Supreme Court "where the principal issue is one of the constitutionality of the law," and pursuant to Rule 204(a), permitting the court of appeals to transfer an appeal to the appropriate appellate court.

## II.    Analysis

The Due Process Clause of the Fourteenth Amendment to the Constitution of the United States protects a parent's "fundamental right" to make decisions concerning the welfare and upbringing of her minor children. *Camburn v. Smith*, 355 S.C. 574, 579, 586 S.E.2d 565, 567 (2003) (citing *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 2060, 147 L. Ed. 2d 49, 56-57 (2000)). However, subsection 63-3-530(A)(33) grants the family court power "to order visitation for the grandparent of a minor child" against the wishes of a parent if the grandparent establishes the elements set forth in the subsection. Those elements are:

1)    at least one parent must be deceased, or the parents must be divorced or "living separate and apart in different habitats," § 63-3-530(A)(33);

2)    the parent has unreasonably deprived the grandparent of the opportunity to visit with the child for more than ninety days, § 63-3-530(A)(33)(1);

3)      the grandparent visitation will not interfere with the parent's relationship with the child, § 63-3-530(A)(33)(2); and

4)      the family court finds by clear and convincing evidence that the parents are unfit, or "there are compelling circumstances to overcome the presumption that the parental decision is in the child's best interest," § 63-3-530(A)(33)(2)(a), (b).

Tammie argues subsection 63-3-530(A)(33) is unconstitutional because it infringes on her right as a parent to decide when and under what circumstances the grandparents may visit the children over her objection. She also argues—even if the subsection is not unconstitutional—the family court applied it in her case in such a way as to unconstitutionally infringe on her parental decision-making authority.

## A.      Constitutionality of Subsection 63-3-530(A)(33)

Tammie relies primarily on *Troxel*, in which the Supreme Court of the United States found a "nonparental visitation statute" in the State of Washington to be "breathtakingly broad." 530 U.S. at 67, 120 S. Ct. at 2061, 147 L. Ed. 2d at 57. "Thus," the Supreme Court held, "in the State of Washington a court can disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests." 530 U.S. at 67, 120 S. Ct. at 2061, 147 L. Ed. 2d at 57-58. The Court recognized that the Due Process Clause of the Fourteenth Amendment "'provides heightened protection against government interference with certain fundamental rights and liberty interests,'" 530 U.S. at 65, 120 S. Ct. at 2060, 147 L. Ed. 2d at 56 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 2267, 138 L. Ed. 2d 772, 787 (1997)), and "the interest of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests," 530 U.S. at 65, 120 S. Ct. at 2060, 147 L. Ed. 2d at 56; *see also* 530 U.S. at 66, 120 S. Ct. at 2060, 147 L. Ed. 2d at 57 (stating "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children"). A plurality of four Justices stated "the visitation order in this case was an unconstitutional infringement on [the parent's] fundamental right to make decisions concerning the care, custody, and control of her

two daughters." 530 U.S. at 72, 120 S. Ct. at 2063, 147 L. Ed. 2d at 60. Two other Justices concurred in the judgment. 530 U.S. at 75, 80, 120 S. Ct. at 2065, 2067, 147 L. Ed. 2d at 62, 65.

Although the Court left open "the precise scope of the parental due process right in the visitation context," 530 U.S. at 73, 120 S. Ct. at 2064, 147 L. Ed. 2d at 61, the Court's plurality set out general parameters a nonparental visitation statute should include to avoid infringement on a parent's constitutional rights. Tammie argues—and we agree—those parameters include "three key principles to promote proper visitation: (1) there must exist a 'presumption that a fit parent will act in the best interest of his or her child,' (2) the decision of a fit parent concerning grandparent visitation is entitled deference, and (3) the impact to the parent-child relationship should be considered." Appellant's Br. 12 (citing and quoting *Troxel*, 530 U.S. at 68-70, 120 S. Ct. at 2061-62, 147 L. Ed. 2d at 58-59).

Subsection 63-3-530(A)(33) addresses each of the "parameters" Tammie contends are not addressed. First, subsection 63-3-530(A)(33)(2)(b) specifically recognizes a "presumption that the parental decision is in the child's best interest." Second, we have repeatedly interpreted subsection 63-3-530(A)(33) to require that the decision of the parent—protected by Due Process—be given substantial deference. *See Marquez v. Caudill*, 376 S.C. 229, 248, 656 S.E.2d 737, 747 (2008) (repeating "the court must give 'special weight' to a fit parent's decision regarding visitation" (citing *Camburn*, 355 S.C. at 579, 586 S.E.2d at 567)).[1] Third, subsection 63-3-530(A)(33)(2) specifically requires the family court to find "grandparent visitation would not interfere with the parent-child relationship."

Tammie's primary argument, however, focuses on the fourth element, and in particular, the requirement of "compelling circumstances." Tammie argues that because the term "compelling circumstances" is undefined, "the statute fails to provide the necessary tailoring to withstand [the] strict scrutiny" the Due Process Clause requires. *See In re Luckabaugh*, 351 S.C. 122, 140, 568 S.E.2d 338, 347

---

[1] In *Camburn*, we referenced the Supreme Court's criticism in *Troxel* of the State of Washington nonparental visitation statute's failure to require any "special weight" be given to a fit parent's determination of the children's best interests. 355 S.C. at 579, 586 S.E.2d at 567 (quoting *Troxel*, 530 U.S. at 69, 120 S. Ct. at 2062, 147 L. Ed. 2d at 58).

(2002) ("Legislation restricting or impairing a fundamental right 'is subject to "strict scrutiny" in determining its constitutionality.'" (quoting *Hamilton v. Board of Trustees*, 282 S.C. 519, 523, 319 S.E.2d 717, 720 (Ct. App. 1984))). She contends, "The statute effectively permits the family court to second guess parental decisions for any reason it wants by not providing criteria, like harm," and the statute "improperly allows the State to override parental decisions based on its own determination that the circumstances presented are compelling." For reasons we will explain in Section II B in our discussion of each element in the factual context of this case, we reject Tammie's argument.[2]

Therefore, we find subsection 63-3-530(A)(33) is not unconstitutional. *See Marquez*, 376 S.C. at 249, 656 S.E.2d at 747 (stating "we have already ruled that the grandparent visitation statute is not facially invalid because it can be constitutionally applied in the appropriate circumstances" (citing *Camburn*, 355 S.C. at 579-80, 586 S.E.2d at 568)).[3]

## B.    Subsection 63-3-530(A)(33) as Applied

Our finding subsection 63-3-530(A)(33) is constitutional means that if the subsection is applied correctly, there will be no unconstitutional infringement on the

---

[2] Tammie also argues "the statute does not require any evaluation of the petitioning grandparent, including whether a grandparent is a fit caregiver." We disagree. A family court must consider the fitness of a grandparent in determining whether the denial of visitation, or any limitation, is unreasonable under the second element. *See Camburn*, 355 S.C. at 580, 586 S.E.2d at 568 (relying on evidence of grandparent unfitness in finding the mother's decision to deny visitation was reasonable).

[3] Subsection 63-3-530(A)(33) has been overhauled since our decisions in *Camburn* and *Marquez*. In 2010, the subsection was amended to include for the first time requirements of "unreasonably depriving" visitation and "compelling circumstances" to overcome the presumption in favor of a fit parent's decision. Act No. 267, 2010 S.C. Acts 1920, 1921. The subsection was amended in 2014 to eliminate the additional 2010 requirement "the grandparent maintained a relationship similar to a parent-child relationship with the minor child." Act No. 270, 2014 S.C. Acts 2524, 2524; *see Grantham v. Weatherford*, 425 S.C. 111, 116, 819 S.E.2d 765, 767-68 (Ct. App. 2018) (quoting the 2010 version).

parent's fundamental right to make decisions concerning the welfare and upbringing of her minor children. If the subsection is not applied correctly, however, there could be such an unconstitutional deprivation. Because we review substantive decisions of the family court de novo, *Stoney v. Stoney*, 422 S.C. 593, 596, 813 S.E.2d 486, 487 (2018), we proceed to ensure the subsection is applied correctly in this case by examining each of the elements the grandparents must satisfy.

Stacey's death satisfies the first element.[4] The remaining elements will require more analysis.

As to the second element, we find Tammie deprived the grandparents of the opportunity to visit. Officially, Tammie contends she is willing to permit visitation. In her answer, Tammie denied the allegation she did not allow Laverne and Pansy to visit their grandchildren. She testified she never said "no" when they requested visitation. While she admitted she is "not accommodating them the way they would like for me to," she testified she has "no issues" with them calling and visiting the children. As the family court found, "[Tammie] stated several times that she had no objection to the grandparents seeing the children at extracurricular functions, school functions, visits at or near the vicinity of the children's home, and had no issue with the children having telephone contact with the grandparents."

In reality, however, Tammie has consistently refused to permit the grandparents to visit with the children. Laverne and Pansy both testified they attempted to call and visit on numerous occasions. Tammie conceded this in her testimony. However, Tammie repeatedly refused to accept or return their calls when they tried to schedule a visit. On several occasions, they called and asked one of the children to check with Tammie for permission to visit, but Tammie never responded. Even at trial Tammie resisted allowing visitation. When asked whether she would be willing to provide the grandparents with a calendar of school and extracurricular functions so the grandparents could attend, Tammie repeatedly stated they could find that information on "the website."

The family court found Tammie "has . . . denied the grandparents opportunity to visit with the minor children by failing to allow communications." We agree with that

---

[4] As we will explain in our discussion of *Marquez* below, Stacey's death is relevant to the fourth element. However, it "satisfies" only the first element.

finding. Tammie claims she is willing to allow visitation. Nevertheless, the grandparents have not been able to see the children since Thanksgiving 2015, except on a few occasions when they showed up unannounced at the children's home or at sporting events, despite Tammie's admonition against doing so.

Also as to the second element, we must consider whether Tammie depriving the grandparents the opportunity to visit the children has been unreasonable. The family court found Tammie's denial was unreasonable, and we agree. Tammie testified, "I know they love [their grandparents]." The guardian wrote in her report, "There is certainly a benefit to maintaining a connection and contact between the girls and their father's side of the family." Tammie explained the children had a hard time getting over the death of their father and described her own efforts to ensure "the girls would never forget their father." Tammie testified she frequently needs someone to stay with the eldest daughter or the twins while she is out with one of the others. The children's grandparents could easily fill this role, and they have clearly indicated their eagerness to serve it. There are, therefore, several reasons Tammie should welcome and encourage visitation.

The important question for the "unreasonably" requirement of the second element, however, is whether Tammie has any reason to prevent the visitation. If she has a legitimate reason to do so, the Due Process Clause and subsection 63-3-530(A)(33) require that her reasonable decision be honored. In *Camburn*, for example, the mother refused visitation with the grandparents "because she felt it was not a 'healthy environment.'" 355 S.C. at 577, 586 S.E.2d at 567. We stated, "She objects that Grandfather drinks, uses abusive language, and denigrates the children's fathers. Because Grandfather was physically and mentally abusive to her when she was a child, she does not consider him her father." *Id.* Refusing visitation under those circumstances was reasonable, and in *Camburn* we upheld the mother's refusal on that basis. 355 S.C. at 580, 586 S.E.2d at 568; *see also Brown v. Key*, 425 S.C. 490, 498, 823 S.E.2d 212, 216 (Ct. App. 2019) (finding the mother's decision to limit visitation was reasonable where she "wanted the visitation supervised because of the hostility between the parties following Father's death and because Child was young and had not spent much time with Grandmother").

The burden of proving the unreasonableness of Tammie's behavior is on the grandparents. However, nothing in this record suggests any reason Tammie may have for denying visitation as she has done. We see no basis for legitimate concern over the fitness of the grandparents, or their ability to adequately supervise the

children during visits. The family court found Tammie "was allowing her feelings about the grandparents to interfere with what may be in the best interests of the children." Animosity against the grandparents is not a valid reason to deny them visitation. While we are careful to keep the burden of proof on the grandparent seeking visitation, a reasonable denial of visitation must have some basis in the parent's view of the best interest of the child.

We pause here to stress that whether a parent's decision to deny visitation is unreasonable is not dispositive of a subsection 63-3-530(A)(33) analysis. It is only one of the elements. The grandparents must still establish the other elements. As we stated in *Marquez*, "The fact . . . the parents refusal is simply not reasonable . . . does not justify government interference in the parental decision." 376 S.C. at 249, 656 S.E.2d at 747. We find, however, the second element is satisfied in this case because Tammie has been "unreasonably depriving the grandparent[s] of the opportunity to visit with the child[ren]."

As to the third element, there is no evidence anywhere in this record that grandparent visitation will interfere with Tammie's relationship with her children. Nor has Tammie argued that it might. In fact, the only indication in this record is that a healthy relationship between the children and their paternal grandparents will be good for the children and will not interfere with Tammie's relationship with her children.

We now turn to the pivotal issue in this case, the fourth element. No one questions Tammie's fitness as a parent. Therefore, the grandparents must satisfy this element with clear and convincing evidence of "compelling circumstances" to overcome the presumption in favor of a fit parent's decisions about her children. We begin our discussion of this element by addressing two legal arguments Tammie makes concerning what circumstances may be sufficiently "compelling" to avoid infringement of her constitutional rights.

First, she argues the undefined term "compelling circumstances" leaves the family court with "ungoverned" discretion to second-guess sound decisions of a fit parent. We disagree. We have construed the term "compelling circumstances" narrowly— and will continue to do so—in light of the constitutional rights it is designed to protect. *See, e.g.*, *Camburn*, 355 S.C. at 579, 586 S.E.2d at 568 ("The fact that a child may benefit from contact with the grandparent, or that the parent's refusal is simply not reasonable in the court's view, does not justify government interference

in the parental decision.").[5]  As the remainder of our discussion will demonstrate, a family court may not overrule a fit parent's decision and impose grandparent visitation based on its own view of the child's best interests, or its own conception of what is a compelling circumstance.

Second, Tammie argues we should overrule *Marquez* to the extent it holds the death of a parent is a "compelling circumstance" to justify invalidating a parent's decision regarding visitation.  We believe Tammie reads *Marquez* too broadly.  *Marquez* was "an extremely close case," 376 S.C. at 250, 656 S.E.2d at 748 (Toal, C.J., concurring in part), with remarkably unique circumstances.[6]  In those unique circumstances, we stated "a biological parent['] s death *and* an attempt to maintain ties with that deceased parent['] s family may be compelling circumstances justifying ordering visitation over a fit parent['] s objection."  376 S.C. at 249, 656 S.E.2d at 747 (emphasis added).  It was the need to "maintain ties" for the benefit of the children in the unique circumstances—not merely the death of the mother—that drove our decision in *Marquez*.  *Marquez* does not stand for the proposition that a biological parent's death

---

[5] *See infra* note 7.

[6] The mother had one very young child before she married David Caudill.  376 S.C. at 233, 656 S.E.2d at 739.  The father of that child was never involved, and his parental rights were terminated.  376 S.C. at 234, 656 S.E.2d at 739.  Five years after the mother married David, they had a child together.  376 S.C. at 233, 656 S.E.2d at 739.  When the second child was almost four, the mother committed suicide.  *Id*.  At the time of her death, she and David were separated, and David had pending an action for custody of both children.  376 S.C. at 234, 656 S.E.2d at 739.  When the mother died, the grandmother sued for custody.  376 S.C. at 233, 656 S.E.2d at 739.  The first child "consistently had behavioral problems."  376 S.C. at 236, 656 S.E.2d at 740.  Two guardians "testified [the children] should not be divided."  376 S.C. at 239, 656 S.E.2d at 742.  In these unique circumstances, the family court permitted David to adopt the first child, and awarded him custody of both children.  376 S.C. at 234, 656 S.E.2d at 739.   The court then proceeded to analyze whether the grandmother should have visitation, "analyz[ing] the visitation issue as if the Stepfather is the biological father."  376 S.C. at 247, 656 S.E.2d at 746.  The facts and circumstances of *Marquez* bear little relationship to the facts here.

alone may be a compelling circumstance.[7] There is, therefore, no reason to question our decision in *Marquez*.

Many courts have recognized "significant harm" to a child resulting from unreasonably deprived grandparent visitation as a compelling circumstance. *See, e.g.*, *Marquez*, 376 S.C. at 249, 656 S.E.2d at 747 (reciting "significant harm to the child" as an example of a "compelling circumstance"); *Camburn*, 355 S.C. at 579, 586 S.E.2d at 568 (same); *see also Blixt v. Blixt*, 774 N.E.2d 1052, 1060 (Mass. 2002) (requiring "the grandparents must allege and prove that the failure to grant visitation will cause the child significant harm"); *Williams v. Williams*, 501 S.E.2d 417, 418 (Va. 1998) (interpreting Virginia nonparental visitation statute to require finding of harm to the child from denial of visitation as condition precedent to awarding visitation).

Here, there is no allegation—and no proof—that denial of visitation to the grandparents will cause significant harm to the children. The family court did not specifically identify any compelling circumstance in this case. Rather, the family court relied on an overbroad interpretation of *Marquez*, stating,

> The Court in *Marquez* . . . held that "a biological parents death and an attempt to maintain ties with that deceased parents family may be compelling circumstances justifying ordering visitation over a fit parents objection." In the present case we appear to have just that situation of the death of a parent. It is also established . . . the parties are unable or unwilling to communicate with each other and all three of the children have expressed a desire to visit with their paternal grandparents.

Unlike in *Marquez*, however, the family court in this case did not explain any reason there is a need to maintain ties for the benefit of the children. Without such an

---

[7] We decided *Marquez* in 2008, before the Legislature amended subsection 63-3-530(A)(33) to include the requirement of a "compelling circumstance." *See* Act No. 267, 2010 S.C. Acts at 1921. However, this Court has enforced the "compelling circumstance" requirement since 2003, when we decided *Camburn*. 355 S.C. at 579, 586 S.E.2d at 568.

explanation based on specific circumstances, the simple facts a parent died, the mother is "unwilling to communicate," and "the children have expressed a desire to visit" do not satisfy the fourth element.  Thus, we do not agree that this finding by the family court is a "compelling circumstance" sufficient to justify overruling Tammie's decision.

Fulfilling our duty to conduct a de novo review, *Stoney*, 422 S.C. at 596, 813 S.E.2d at 487, we proceed to examine whether the grandparents established compelling circumstances by clear and convincing evidence.  As we explained above, Tammie has consistently *said* she consents to visitation at the same time she has consistently *refused* to permit it.  Certainly, Tammie is aware the courts may order visitation only if she refuses it.  With this knowledge, she attempted to keep the courts from getting involved by pretending to consent.  Tammie insists the grandparents must call to get permission to come to her house to see the children, knowing she will then refuse to answer the phone.  This is one example of how Tammie has manipulated the judicial process for the purpose of preventing the grandparents from seeing the children.  *See Brown*, 425 S.C. at 498, 823 S.E.2d at 217 (recognizing the danger that "a parent can circumvent the statute by intentionally and disingenuously thwarting a grandparent's ability to meet the statutory requirements—for example, by . . . intentionally offering visitation when parent knows grandparent cannot be available").

At oral argument before this Court, counsel for the grandparents moved to supplement the record with the family court's September 2018 order finding Tammie in contempt for continuing to refuse to allow visitation.  By subsequent written order of the Chief Justice, we granted the motion.  In the contempt order, the family court found Tammie "willfully failed to comply" with the November 2017 order.  The family court also found the following,

- "As of [August 20, 2018], despite repeated timely requests for visitation by [the grandparents], there has been absolutely no visitation between [the grandparents] and their grandchildren;"
- Tammie refused to provide the grandparents a calendar of the children's activities, as required by the November 2017 order;
- "[Tammie] continues to be opposed to visitation . . . and . . . her opposition is exacerbating the situation.  [The grandparents] have attempted to work with [Tammie] to

try to obtain even limited visitation. . . . [A]fter [the grandparents'] attempt to coordinate weekend visits were reportedly thwarted by [Tammie], [they] offered to come to Myrtle Beach on Father's Day of last year and merely take their grandchildren to lunch in the Myrtle Beach area, [Tammie] denied them even that opportunity."

- "It is clear [Tammie] has no intent to comply" with the November 2017 order.

We are mindful that families often do not get along, even under the best of circumstances. In the course of such struggles, family members are not always honest with each other. Ordinarily, deceptive behavior within families is beyond the power of the court to address. Deceptive behavior must end, however, when family members bring their disputes into the court system. Tammie's repeated representations to the family court—and in turn to this Court—that she welcomes visitation, when in fact she refuses it, is unacceptable.

We agree with the family court that Tammie "has unreasonably denied the grandparents opportunity to visit with the minor children by failing to allow communications through the house phone or her cell phone." We find her intentional, deceptive, and now contemptuous behavior—designed to appear accommodating and cooperative while calculated to prevent the visitation she claims to accept—is an intentional effort to keep the court from fulfilling its responsibility under subsection 63-3-530(A)(33) and the Due Process Clause.

Our concern over Tammie's behavior goes beyond the fact she intentionally deceived the court. Her behavior has directly and adversely affected the welfare of the children. She damaged the children's previously positive and loving relationship with their grandparents. More significantly, Tammie's deliberate attempt to remove the family court from its proper role as arbiter of this dispute, combined with her own refusal to communicate with the grandparents, put the children in the unwelcome role of peacemakers between their grandparents and their mother. This has been particularly true with the eldest daughter. In one instance, for example, she sent a text message to her grandfather essentially asking him not to push visitation because she was afraid it would upset her mother. She texted, "Please stop. . . . You're breaking a part of -- a part of my family. I love you, but you're hurting my mom so much, and she needs -- means everything to me." As the family court found

in the September 2018 contempt order, Tammie's refusal to comply with the November 2017 order "is exacerbating the situation."

Tammie's use of deception to keep the family court from fulfilling its duty to manage this dispute, and her continued refusal to comply with the November 2017 order, places her daughters in the completely inappropriate role of mediating the dispute between her grandparents and her mother. No child should ever be placed in such a position.

We find Tammie's intentional, deceptive, and contemptuous behavior—that not only cut off the relationship between the grandparents and the children, but also made them proxies for communication between Tammie and the grandparents—is a compelling circumstance that justifies the State to intervene, and to order that Tammie permit the grandparents to have visitation with the children.

### C.     Visitation Schedule

We now turn to the question of what is the appropriate visitation schedule in this case. We begin by observing that grandparent visitation is not the same as visitation for a parent. *See Dodge v. Dodge*, 332 S.C. 401, 416, 505 S.E.2d 344, 352 (Ct. App. 1998) (finding grandparent visitation "is not the same situation as when the court awards reasonable visitation to a noncustodial parent"). Family courts do not defer to the preferences of a custodial parent in deciding visitation for a noncustodial parent. For grandparent visitation, however, courts must give deference to the judgment of the parent. Just as a court must defer to a parent's decision on the fact of grandparent visitation, a court must also defer to reasonable limitations or conditions a fit parent chooses to impose on grandparent visitation.

In *Troxel* itself, the question was not the fact of grandparent visitation, but whether the court may overrule the parent's decision on limitations to visitation. *See* 530 U.S. at 61, 120 S. Ct. at 2058, 147 L. Ed. 2d at 54 ("Granville did not oppose visitation altogether, but instead asked the court to order one day of visitation per month with no overnight stay."); 530 U.S. at 71, 120 S. Ct. at 2062-63, 147 L. Ed. 2d at 60 (noting "there is no allegation that Granville ever sought to cut off visitation entirely. Rather, the present dispute originated when Granville informed the Troxels that she would prefer to restrict their visitation . . . to one short visit per month and special holidays"). The Supreme Court held the Due Process Clause protects a fit

parent's right to impose limitations on grandparent visitation. 530 U.S. at 72, 120 S. Ct. at 2064, 147 L. Ed. 2d at 60-61.

Similarly, in the court of appeals' recent decision in *Brown*, the question before the court was not the fact of visitation, but whether limitations the mother sought to place on that visitation must be honored. As the court of appeals explained, "Grandmother was offered supervised visitation . . . on multiple occasions." 425 S.C. at 496, 823 S.E.2d at 215. "Grandmother's central point of contention" to the court was "Mother's insistence that visitation be supervised was unreasonable." *Id.* The family court overruled the mother's limitations, but the court of appeals reversed. 425 S.C. at 499, 823 S.E.2d at 217.

In this case, Tammie explained she has concerns about overnight visitation in Pamplico. While she conceded, "I am not accommodating them the way they would like for me to," she justified her reluctance to provide the visitation the grandparents want because "[the children's] lives are in Myrtle Beach, not in Pamplico." She explained,

> My children are very active children. They do soccer, and during soccer season, they have a soccer game every Saturday for the YMCA. My smallest of the twins wants to do travel soccer like her older sister did because she is getting that good. They do, or they did dance last fall. Or last year was dance. [One of the twins is] really into dancing. My oldest daughter is a cheerleader, and she cheers. And also plays soccer. She made JV soccer her seventh grade year, so she's good too.
>
> We are active members in our church. They not only attend church on Sundays but they also attend church on Wednesday nights where they're a member of the GA's, and [the oldest] is in a small youth group.
>
> And it seems like we have something every day. They do tumbling. [The oldest] does private tumbling lessons on Saturdays. She does violin lessons and gymnastics.

So, I mean, they're doing something all the time. They stay active, and they love it.

She further explained, "I don't want them to be affected by this, because they are happy now," and, "I just don't want the girls to be carted off to Pamplico once a month . . . when they have their lives here in Myrtle Beach." At the time Tammie explained these concerns for the welfare of her children, they were 13 and 9.

When fashioning an appropriate schedule of grandparent visitation pursuant to subsection 63-3-530(A)(33), a court must attempt to accommodate a fit parent's reasonable concerns for the welfare of her children. Reasonable limitations a parent chooses to impose on grandparent visitation may not be overruled by a court absent a full subsection 63-3-530(A)(33) analysis as to each such limitation. A court must determine the grandparent has satisfied each of the four elements, particularly the unreasonableness of the limitation and the existence of compelling circumstances.

When applicable, the court should also consider the amount and character of the time the grandparents spent with the children before a parent terminated or limited it. This was a primary consideration for the court of appeals in its recent decision in *Grantham*. There, the family court set what initially appears to be an excessive grandparent visitation schedule: "one weekend of visitation per month" for three full days, "from 5:00 P.M. on Thursday until 5:00 P.M. on Sunday," and "one week of summer visitation." 425 S.C. at 114, 819 S.E.2d at 767-68. After a close examination of the unique facts of that case—particularly the parent-like relationship the grandparents had with the children before the mother committed suicide—the frequency, duration, and character of the visitation the court of appeals approved appear reasonable. The court of appeals explained the nature of the relationship the grandparents had with the children before their mother's death,

> Grandparents . . . helped Mother take care of the children. Grandparents were involved in the children's lives since birth, often taking care of the children multiple times each week. Grandparents maintained a relationship with the children much like parents: taking and picking up the children from school, cooking for the children, bathing the children, buying clothes for the children, and taking the children to doctor's appointments.

425 S.C. at 113, 819 S.E.2d at 766.

When grandparents have such a parent-like relationship, it can be particularly important to the welfare of the children for the court to maintain the relationship. In *Grantham*, the grandparents' close relationship developed because the "[f]ather often worked long shifts and traveled out of town," and the mother "began to suffer from severe depression and substance abuse" when the children were very young. 425 S.C. at 113-14, 819 S.E.2d at 766. When the mother died, family members and others openly suggested the father was responsible for the mother's suicide, and the father "immediately limited how often Grandparents saw the children." 425 S.C. at 114, 819 S.E.2d at 766. There was "a public altercation" between the father's new wife and the grandparents "in front of the children," and another "confrontation" between them over the father's attempts to limit the grandparents' access to the children. *Id.* These circumstances made it important to maintain the grandparents' involvement in the children's lives after their mother's death as a source of stability. However, the father "stopped Grandparents from seeing the children altogether." *Id.* The unique facts of *Grantham* justified the visitation schedule the court of appeals approved in that case.

Here, the grandparents never acted in a parental capacity, and there is no reason to believe they are needed now as a parent-like source of stability in the children's lives. The facts of this case, therefore, are considerably different from those in *Grantham*. Before Stacey died, the grandparents hardly ever had the children overnight. With rare exceptions, the only times the children even went to Pamplico they were with Stacey.[8] Ordinarily, if the grandparents wanted to visit with the children, they had to drive to Myrtle Beach.

With the limitations Tammie sought to impose in mind, and in light of the history of the grandparents' visitation with the children, we turn to the visitation schedule ordered by the family court:

---

[8] As far as we can tell from the record, the children stayed overnight in Pamplico only twice when Stacey was not also there. Tammie described "maybe two date nights" she had with Stacey when the children were in Pamplico by themselves. While there were times Stacey had them in Pamplico and he may have been away from the grandparents' home hunting or fishing, there is no other indication in the record the children stayed overnight with the grandparents in Pamplico without Stacey.

- the children may make unlimited phone contact with the grandparents;
- the grandparents may:
    - place one phone call per week to the children;
    - attend the children's school functions, summer events, and extra-curricular activities (Tammie must provide them a calendar);
    - have eight weekend visits in Pamplico per year, from 9:00 a.m. on Saturday mornings to 4:00 p.m. on Sunday afternoons;
    - have one week visitation each summer, in Pamplico;
    - have one overnight visit in Pamplico to celebrate Christmas that is neither Christmas Day nor Christmas Eve.

We find this visitation schedule is excessive, and violates Tammie's due process right to make decisions for the welfare of her children. The limitations Tammie sought to place on visitation are reasonable under the circumstances that existed at that time. Because of that fact alone, the court may not overrule the limitations. *See* § 63-3-530(A)(33)(1) (the second element, requiring a finding visitation was "unreasonably deprived"). In addition, though Tammie's intentional, deceptive, and contemptuous behavior affecting the well-being of the children is a compelling circumstance that justifies giving the grandparents some visitation, it does not at this time justify overruling Tammie's decision that the children should not have to go to Pamplico. *See* § 63-3-530(A)(33)(2)(b) (the fourth element, requiring a finding of "compelling circumstances"). Finally, the visitation schedule awarded by the family court in this case is a sharp increase in the amount, and a significant change in the character, of visitation the grandparents enjoyed before Stacey died.

For these reasons, we modify the family court's order to permit the following visitation schedule:

- the children may make unlimited phone contact with the grandparents;
- the grandparents may:
    - place one phone call per week to the children;

- attend the children's school functions, summer events, and extra-curricular activities (Tammie must provide them a calendar);
- have at least monthly visits in Myrtle Beach—subject to increase by the family court—for church, a school event, a meal, or some other event planned by the grandparents that does not require an overnight stay;
- have one half-day outing—not an overnight visit—in Myrtle Beach to celebrate Christmas, neither Christmas Eve nor Christmas Day.

We are concerned, however, that Tammie's repeated efforts to prevent visitation for almost four years interfered with the grandparents' ability to rebuild and maintain a beneficial relationship with the children. By preventing the maintenance of the relationship, Tammie may have created the potential for significant harm. It could become a compelling circumstance, therefore, that to rebuild the relationship, it will be necessary to reconsider allowing overnight visits with the grandparents in Pamplico.

Tammie now faces a choice. She may choose to encourage—or discourage—a beneficial relationship between her children and the grandparents. If she chooses the former, this Court is confident the visitation schedule we set will foster a beneficial relationship between the children and the grandparents. If she chooses to discourage the relationship, even if she is in technical compliance with all orders,[9] it will be necessary for the family court to reconsider the prospect of overnight visitation in Pamplico to permit the grandparents to rebuild the loving relationship they had with the children before Stacey died.

The family court's November 2017 order contained more detail as to the specifics of these visits than are set forth in this opinion. For example, the November 2017 order provides the manner in which the grandparents should give Tammie notice of visitation requests, appropriate spacing requirements between visits, and the manner

---

[9] When the family court held Tammie in contempt, it sentenced her to four months in prison, suspended on strict compliance with all court orders. If Tammie continues to disobey court orders, grandparent visitation will likely not be an issue because Tammie will be in jail, and the grandparents will have custody of the children.

in which Tammie must provide a calendar of the children's events. Because the family court is more suited to consider these particulars in light of our modification to the visitation schedule, we remand to the family court for this limited purpose. The family court should hear from the parties, and then impose a detailed visitation order. The new order should be designed to carry out the visitation schedule we have ordered, in a manner to promote cooperation between Tammie and the grandparents, and to suit the needs of all involved, particularly the children.

### III. Conclusion

In *Troxel*, the Supreme Court recognized that the Due Process Clause restricts the power of the State to interfere with a fit parent's decisions about the welfare and upbringing of her child. To ensure we permit no Due Process Clause violations, this Court has strictly scrutinized decisions of our family court allowing grandparent visitation. In this case, Tammie deliberately manipulated the court—detracting it from its duty to conduct this scrutiny—by falsely asserting she would permit visitation, but then consistently refusing it. This Court will not tolerate this manner of deceptive behavior. We affirm the family court's decision to require visitation. Nevertheless, because Tammie's reasonable limitations on visitation must be honored on the current facts of this case, we modify the visitation schedule.

**AFFIRMED AS MODIFIED.**

**BEATTY, C.J., JAMES, J., and Acting Justice John D. Geathers, concur. KITTREDGE, J., concurring in part and dissenting in part in a separate opinion.**

**JUSTICE KITTREDGE:**  I am in agreement with most of Justice Few's excellent majority opinion.  I write separately because I would allow limited overnight visitation in Pamplico, South Carolina.

In my judgment, the critical factor in this case is the prominent and significant role the grandparents had in the lives of their grandchildren prior to the death of Stacey Bazen.  The grandparents have been a positive fixture for the children throughout their lives, at least until Stacey's death.  That, in my judgment, is the key factor that merits a finding of compelling circumstances warranting grandparent visitation.  It is unquestioned that the children spent much time with their grandparents in Pamplico, which is only about fifty miles from Myrtle Beach.  For this reason, I would permit overnight visitation in Pamplico, albeit less frequently than ordered by the family court.

I join in the majority's decision to remand to the family court to order a detailed and specific visitation plan.  Detailed instructions are regrettably necessitated by the shameful conduct of Tammie Bazen, who spoke of her desire for grandparent visitation while maliciously preventing any contact between the children and the grandparents.  Tammie's conduct requires the family court to provide as much detail as possible in the visitation schedule.  Tammie's lies and manipulation foreclose the preferred approach of allowing parties the flexibility to cooperate and work together.  I also join the majority in admonishing Tammie that her continued contemptuous behavior will not be tolerated.

However, in addition to the general visitation schedule set forth in the majority opinion, I would add the following visitation:  overnight, weekend visitation every third month, in Pamplico (or Myrtle Beach, as selected by the grandparents) from Friday at 6:00 PM until Sunday at 6:00 PM, with the grandparents responsible for transportation.  This limited overnight visitation every quarter must not conflict with the children's established activities or as otherwise superseded by the scheduled division of time between Tammie and the grandparents.  I part company with the majority only as to my judgment to allow the grandparents limited weekend overnight visitation four times a year.

I add a final comment.  The family court must carefully assess the current situation.  There are two primary factors involved.  First, the absence of any contact between the children and the grandparents for an extended period of time (caused by Tammie's conduct) may have damaged the children's perception of and relationship with the grandparents.  If so, a gradual break-in period of visitation

may be warranted.  A second factor, irrespective of Tammie's conduct, is simply the ages of the children.  As parents and family court judges understand well, it is often not easy telling a teenager what to do.  Even with fit, mature, and flexible parents and grandparents, teenagers will frequently push back against ordered, mandated visitation.  When this occurs, neither party is to blame.  The presence of these two factors heightens the difficult task that may confront the family court.

I respectfully concur in part and dissent in part.